**Francisco Lucas RODRIGUEZ–ROMAN, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 95–70230.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 7, 1996.*

Decided Oct. 9, 1996.

---

1. *See, e.g.*, United States Sentencing Commission *Guidelines Manual*, Chapter One, Part A, Subpart 4(b).

* The petition was briefed and argued, with excellence, by two students from Western State Uni-

versity College of Law, Nicole Hampton and Sherri L. Honer. They were supervised by Professor Stuart Miller, as required by the Court's policy permitting the handling of appellate proceedings by supervised law students. 9th Cir. R. 46–4. The performance of the students and their professor is a tribute to that program—a program that when properly implemented, as it was in this case, greatly benefits both the students and the court.

418

Nicole Hampton and Sherri L. Honer (law students), Western State University College of Law, Irvine, CA, for petitioner.

Carl H. McIntyre, Jr. (on the brief), and David M. McConnell (argued), Office of Immigration Litigation, United States Department of Justice, Washington, DC, for respondent.

Before REINHARDT, KOZINSKI, and HAWKINS, Circuit Judges.

Opinion by Judge REINHARDT; Concurrence by Judge KOZINSKI; Special Concurrence by Judge REINHARDT and Judge HAWKINS.

REINHARDT, Circuit Judge:

Francisco Lucas Rodriguez–Roman, a native and citizen of Cuba, asserts that he left Cuba for political reasons and that, if deported, he would be subjected to prolonged incarceration, and possibly even death, for his unauthorized departure. He seeks review of the Board of Immigration Appeals (BIA) decision denying his requests for withholding of deportation and asylum under sections 243(h) and 208(a) of the Immigration and Nationality Act, 8 U.S.C. §§ 1253(h) and 1158(a) (1995). Adopting the decision of the Immigration Judge (IJ), the BIA determined that

because Rodriguez would be punished pursuant to Cuban criminal law, the punishment, no matter how severe, could not constitute persecution. We disagree and grant his petition.

## I

Rodriguez, a 36–year–old native and citizen of Cuba who harbored life-long anticommunist beliefs, fled Cuba and entered the United States without inspection in October of 1982. He was born in Havana, where he received a college education and became a teacher. He later joined the merchant marine so that he could plan his escape from the "Communist system and [its] injustices." After serving as a crew member for several years, during which time he worked on vessels that operated exclusively in Cuban waters, he was finally permitted to sail on voyages into foreign waters. He bided his time, waiting for an opportunity to escape. On his third trip abroad, he jumped ship and fled to the United States, where he applied for asylum on April 15, 1983.

On January 6, 1986, Rodriguez received an order to show cause why his illegal entry should not subject him to deportation. On November 18, 1986, at a hearing before an IJ, he conceded deportability but requested asylum, withholding of deportation, and voluntary departure. The IJ adjourned the hearing to permit him to file an application for asylum.[1]

Rodriguez based his application for asylum on his illegal flight from Cuba. He described "leaving without [the] permission of . . . the government [ ] as . . . a serious crime. . . ." He stated that having "escap[ed] the regime," he had, "in the eyes of the Cuban Communists and in [his] own eyes, demonstrated [his] antipathy for [Cuba], which completely inhibits the exercise of any freedom." His crime was particularly egregious,

he explained, because he had "embarrassed the government." He had received various benefits from the Cuban government—his education and his position as a crew-member—but he "threw these in their face when [he] left the country." For "going to Mexico and the United States without having permission from the Cuban government," he stated, he would face imprisonment for 15 to 20 years or a death sentence.

At an August 8, 1990 hearing on the merits, Rodriguez presented extensive evidence in support of his requests for asylum and withholding of deportation. He testified that since his youth he had detested the Communist system and its lack of freedom, and had long planned to come to the United States to live in a free country. He testified that when he became unable to continue working as a teacher, he joined the merchant marine (which, he said, is not considered part of the military) so that he could escape. He stated that by leaving Cuba, he became a traitor in the eyes of the Cuban government, and that traitors are punished with twenty years in prison or death.[2] The main thrust of his claim for asylum, he testified, was that he would be incarcerated, or perhaps executed, because of his political beliefs if he were returned to Cuba.

Rodriguez described the consequences his escape has had on his family. He stated that one of his brothers had been arrested and imprisoned for months because the authorities believed he knew of or assisted in Rodriguez's flight, and that since his release he has been unable to find work because he was suspected of having helped him. He testified that his two other brothers had lost their jobs as well.[3] He said that his father had been "interrogated" and told that "his son was a traitor," and had later committed suicide. Finally, he stated that his family had

---

**1.** An application for asylum is deemed to be an application for withholding of deportation. *See* 8 C.F.R. § 208.3(b) (1995).

**2.** In a statement sworn to on September 16, 1988, Rodriguez explained that "[t]o escape from Communism is a crime that Fidel Castro's Government calls treason to the fatherland and humiliation to the Marxista Leninista Commencement, this is the crime most punishable." He

explained that, if returned, he would be punished as an example to others—to dissuade others from attempting to leave Cuba.

**3.** In a statement sworn to on September 16, 1988, Rodriguez explained that these two brothers had since been able to find work but only the most menial kind.

come under suspicion, been ostracized by the community, and been subjected to surveillance.

Two witnesses, both of whom had been political prisoners in Cuba, testified on Rodriguez's behalf. The first, Leon Franco, had been imprisoned for nine years. In his affidavit, Franco explained that only a person who has the confidence of the Cuban government is granted the right to travel abroad, and stated that if a person granted that right were to defect, "asking for political asylum in a foreign country and later moving to the United States," he would be "classified" as an "ENEMY OF HIGH DANGER," tried before the Court of Crimes Against State Security, and sentenced to between three and twenty years.[4] Such a person, he stated, would "spend many years in prison for the crime of looking for FREEDOM."

At the hearing, Franco explained that he based his opinions on his observation of inmates who had left Cuba without permission and his conversations with them while in prison. He testified that Rodriguez, if returned, would be considered a traitor, incarcerated, and singled out for harsh treatment. He stated that inmates considered to be traitors were forced to share cells with deranged and violent inmates who might kill them. He also explained that while some traitors were incarcerated for from three to twenty years, others were subjected to indefinite sentences or shot. Last, he stated that the authorities also subjected traitors to a "moral death," subjecting them to abuse and denying them visits and medical attention.

The second witness, Romero Menendez, had been imprisoned for five years. He testified that while in prison he had met many inmates whose only crime was attempting to escape Cuba. He stated that those inmates were treated worse than the general population of the prison. Although he had not witnessed the killing of any inmates consid-

ered to be traitors, he said that many had "disappeared."

In an order dated August 9, 1990, the IJ denied Rodriguez's application for asylum. He reached several preliminary conclusions. First, he noted Rodriguez's testimony that he "harbored life-long anti-Communist sympathies," and concluded that Rodriguez fled Cuba "due to his political beliefs." Second, he noted that Rodriguez feared that, if returned to Cuba, he would be "arrested for illegally leaving the country, desertion and treason," and found that Rodriguez had established "a clear probability of being arrested for these crimes." Last, he noted Rodriguez's fear that he would receive a lengthy sentence, as well as the testimony of Rodriguez's witnesses regarding the treatment of traitors, the report by Amnesty International, and the opinion of the State Department,[5] and described the punishment that Rodriguez would face, if returned, as "harsh, if not fatal."

The IJ determined, however, in a Kafkaesque decision, that Rodriguez "would not be punished for his beliefs, but for committing crimes against the socialist state of Cuba." He properly construed the gravamen of Rodriguez's claim to be that prosecution for illegal departure "would be tantamount to persecution for political opinion." He had no doubt that the laws Rodriguez violated were, at least in part, politically motivated. However, that did not mean, he concluded, that those "laws become unenforceable as political persecution." Although the sentences in Cuba for illegal departure "appear[ed] to be harsh," he stated with stunning bureaucratic logic that he could not "take on the burden of assessing criminal penalties in a foreign country in the guise of political persecution." It is not surprising in light of this reasoning that he cited as an example of national attitudes toward the type of "crime" committed

---

4. Rodriguez also submitted a report from Amnesty International entitled *Cuba, Political Imprisonment—An Update,* January 1988. The report stated that Arcos Bergnes, who had served a six-year sentence for illegal exit, had been released on May 4, 1987, but that his brother Gustavo, who had been convicted of the same offense, had not yet been released. The report noted the arrest and imprisonment of three people who had *at-*

*tempted* to leave the country illegally. Those three received sentences of two years, three years, and three years and nine months.

5. The State Department opined that the punishment for illegal departure in Cuba is approximately three years of incarceration.

by Rodriguez this country's execution of Private Slovik during World War II.[6]

On December 1, 1994, in a per curiam opinion, the BIA affirmed the IJ's decision and dismissed Rodriguez's appeal. After conducting an independent examination, reviewing the "contentions on appeal, the record of proceedings, and the immigration judge's decision," it affirmed, "based upon and for the reasons set forth in that decision." Despite having expressly adopted the opinion of the IJ, the BIA wrote three paragraphs of its own regarding Rodriguez's requests for asylum and withholding of deportation. Exclusively citing cases involving desertion from military service, and emulating the tone set by the IJ, the BIA concluded that "whatever problems [Rodriguez] may encounter as a result of his illegal departure and desertion from the merchant marine will be the result of prosecution for violating the laws of Cuba, and that [those problems] will not constitute 'persecution.'" Accordingly, the BIA "reasoned" that Rodriguez had not shown that a reasonable person in his circumstances would fear persecution, and as a result, that he was not eligible for either asylum or withholding of deportation.[7]

On January 3, 1995, Rodriguez, on the advice of prior counsel, mistakenly sent a pro se petition to the Eleventh Circuit instead of to this court. Because venue was improper in the Eleventh Circuit, the pro se petition was at some point returned to him by the clerk of that court. He then filed a petition in this court on March 20, 1995.

## II

By the time Rodriguez filed his petition for review with this court, ninety-nine days after the BIA had issued its decision, the petition was not timely. See 8 U.S.C. § 1105a(1) (requiring that petition be filed within ninety days of the BIA's decision). Rodriguez contends that we nonetheless have jurisdiction under the federal transfer statute, 28 U.S.C. § 1631, because he timely submitted a petition for filing with the Eleventh Circuit which we may deem to have been transferred and timely filed in this court. The government argues that "[n]either [the transfer statute] nor any other precedent suggests that the [attempted filing or] filing of an action in the wrong Circuit, without any ... transfer, could ever give a Court jurisdiction over the timely filed action in another circuit." We agree with Rodriguez.

"Jurisdictional defects that arise when a suit is filed in the wrong federal court may be cured by transfer under the federal transfer statute, 28 U.S.C. § 1631." *Clark v. Busey,* 959 F.2d 808, 812 (9th Cir.1992). That statute provides:

> [w]henever a civil action is filed in a [federal] court ... or an appeal, including a petition for review of administrative action, is noticed for or filed with such a court and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had

---

**6.** The IJ first noted that the penalty for treason has always been severe: that in seventeenth-century England, "a civilized country," the punishment was "hanging, drawing, and quartering"; he then pointed to this country's execution of Private Slovik for desertion during time of war. The IJ appeared to believe that these historical examples somehow justify our government's engaging in similar conduct today, including sending Rodriguez to his possible death because of his opposition to Cuban Communism. While this analysis is too appalling to require any response, we note that, ironically, the execution of Private Slovik is not generally thought of as a symbol of the historic policy of executing wartime military deserters but is known to many as the type of unfortunate event that occurs in the

absence of provisions for appropriate judicial review. See William Bradford Huie, *The Execution of Private Slovik* (1954). All this is wholly aside from the fact that there can be no valid comparison between a wartime military deserter and a political refugee, whether or not the refugee happens to be a member of his country's merchant marine.

**7.** The BIA also considered Rodriguez's claim that the IJ erred by failing to inform him of his right to apply for suspension of deportation. Rodriguez seeks review of this decision as well. In light of our decision regarding Rodriguez's requests for asylum and withholding of deportation, we need not address it.

been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred. 28 U.S.C. § 1631 (1995). "Section 1631 does not itself establish jurisdiction, but rather corrects lack of jurisdiction only in cases that are actually transferred *or are at least transferable.*" *Clark,* 959 F.2d at 812 (emphasis added); *see Kolek v. Engen,* 869 F.2d 1281, 1284 (9th Cir.1989) (concluding that petitioner's appeal, which was *transferable,* would be deemed to have been transferred to this court); *In re McCauley,* 814 F.2d 1350, 1352 (9th Cir.1987) (same).

■ The government contends that for this court to have jurisdiction, the Eleventh Circuit must have transferred Rodriguez's petition. This contention is explicitly contradicted by *Clark, Kolek,* and *McCauley,* which permit the lack of jurisdiction to be cured under § 1631 even if a case was not actually transferred, so long as it is transferable. In two of those cases, *Kolek* and *McCauley*— the two in which we concluded that the "interest of justice" test was met—we deemed the cases transferred even though the courts in which they were filed did not, themselves, act to transfer them.

■ The government also contends that *Kolek* and *McCauley* are inapplicable because they involved cases deemed transferred from district courts within our circuit, while this case involves a case that we would have to deem transferred from one court of appeals to another. This argument is, at least in this case, without merit.

First, the statute draws no distinction between district courts and circuit courts. Section 1631 refers to transfer of a civil action or an appeal filed in a court as defined in § 610 to *any* other such court in which the action or appeal could have been brought at the time it was filed or noticed. Section 610, in turn, defines "court" to include, among others, courts of appeal and district courts of the United States. *See F.D.I.C. v. McGlamery,* 74 F.3d 218, 220 (10th Cir.1996) (stating that district court could transfer "an action to *any* other court in which the action could have been brought if the court finds there is a

want of jurisdiction and if the transfer is in the interests of justice") (emphasis added).

■ Second, given the statute's remedial purpose of eliminating the risk of filing in the wrong court, *see In re McCauley,* 814 F.2d at 1351–52; *Alexander v. Commissioner of Internal Revenue,* 825 F.2d 499, 501 (D.C.Cir. 1987), we do not believe that the identity of the court in which a petition or appeal is erroneously filed is relevant. The purpose of the statute is "to 'aid litigants who were confused about the proper forum for review,'" *McCauley,* 814 F.2d at 1352 (citation omitted), and to prevent any prejudice from such confusion when it is in the interests of justice, *see Alexander,* 825 F.2d at 501 (quoting 128 Cong. Rec. 3572 (1982)) (stating that "'a case mistakenly filed in the wrong court [should] be transferred as though it had been filed in the transferee court on the date on which it was filed in the transferor court'"). That purpose is served regardless of whether a litigant makes a mistake between a district court and a circuit court or between two circuit courts.

The government offers no reason why we should deem a case transferred from one court but not from another or, to put it slightly differently, why we should now limit the rule that "transferability" is sufficient, so that it applies only to some transferor courts and not to others. We find only one reason for such a possible limitation noted in any case—and that in a case not cited by the government. The First Circuit has suggested a reluctance to *overrule a decision* issued by another circuit which has denied a transfer request. *See Howitt v. United States Dep't of Commerce,* 897 F.2d 583, 584 (1st Cir.), *cert. denied,* 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990) (finding no legal authority that would permit one circuit to review another circuit's decision not to transfer a case, but concluding that even if there were such authority, the case was sufficiently weak on the merits that transfer was not "in the interests of justice"). While in *Howitt* the Federal Circuit ordered the case dismissed, apparently without expressly discussing the transfer issue, the First Circuit made it plain that what it was concerned about was

the overruling of another circuit's determination on the transfer question. *Id.*

To the extent that there is any concern about offending the dignity of a co-equal circuit, that concern is not implicated in the present case. Because the petition was returned to Rodriguez by the clerk of the court and never actually filed in the Eleventh Circuit, that court never considered or decided the transfer issue. Accordingly, we are not called upon to review or overrule, directly or indirectly, a transfer decision of the Eleventh Circuit, or even a decision to dismiss. Instead, the question before us is whether in light of the clerk's failure to file the petition, we should now deem it filed and transferred. We conclude that the answer is yes.

As to the first part of the inquiry—whether the petition should be deemed filed—we note preliminarily that while the administrative record is unclear as to whether Rodriguez's petition was actually filed in the Eleventh Circuit, a review of the records of the Eleventh Circuit demonstrates conclusively that it was not, and that no docket number was assigned to it. It appears that the clerk of the court simply returned the petition to Rodriguez when it was discovered that Rodriguez had submitted it to the wrong circuit for filing. Indeed, that is how Rodriguez has described what occurred. When directed to show cause why his petition should not be dismissed for lack of jurisdiction, he explained that he incorrectly submitted his petition to the Eleventh Circuit and that it was returned to him. The government does not contest this statement or raise any factual issue regarding it. Accordingly, we find that the petition for review was timely submitted for filing in the Eleventh Circuit and subsequently returned to Rodriguez by the clerk.

■ The general rule is that when the clerk of the court mistakenly rejects papers or fails to act on them, they are deemed filed on the date on which the clerk first had possession of them. *See Smith v. Frank*, 923 F.2d 139, 141 (9th Cir.1991) (noting the general rule that papers and pleadings as well as notices of appeal are considered filed " 'when they are placed in the possession of the clerk of the court' ") (quoting *Cintron v. Union Pac. R. Co.*, 813 F.2d 917, 920 (9th Cir.1987) (quoting 4A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1153 (1969))); *cf. Forelaws on Board v. Johnson*, 743 F.2d 677, 680 (9th Cir.1984), *cert. denied*, 478 U.S. 1004, 106 S.Ct. 3293, 92 L.Ed.2d 709 (1986) ("Our clerk's mistaken rejection of the complaint when it was timely offered should not bar its consideration, and it should be deemed timely filed."). The difference here, of course, is that the clerk may well have been free under the rules of the Eleventh Circuit to return the petition rather than to file it, even though, as a result, the court was deprived of the opportunity to exercise its statutory authority to determine whether to transfer the case to this court. The difference is of no consequence here.

The purpose of the statute, as we stated earlier, is to aid litigants who were confused about the proper forum for review. It contemplates that those litigants who submit papers for filing in the wrong court will suffer no prejudice as a result of the error, if transfer is in the interests of justice. The statute would be frustrated if we deprived a litigant of its benefits simply because the clerk of the court made the determination that his papers were submitted for filing in the wrong court.[8] Indeed, it is only when such an error occurs that the statute applies, and it is only then that the statute requires that the court determine whether transfer is appropriate.[9] Accordingly, for purposes of the transfer statute, we deem the petition to

---

8. It is no answer to suggest that a litigant may correct the error himself by filing in the proper court once the clerk returns his papers to him. Appeals and petitions are subject to strict time limits, and the delay involved might result in the forfeiture of the litigant's rights. From the standpoint of meeting the jurisdictional time limits, the critical point is the point at which the court receives the litigant's papers for filing. *See Smith*, 923 F.2d at 141.

9. The duty imposed on the court is mandatory. It *must* determine whether transfer is in the interests of justice. *See General Atomics v. United States Nuclear Regulatory Comm'n*, 75 F.3d 536, 539 (9th Cir.1996) ("The transfer of a suit to solve a jurisdictional defect is a mandatory procedure controlled by federal law.").

have been filed when Rodriguez submitted it to the clerk of the court.[10]

As to the question whether the petition should be deemed transferred to this court, the rule is that a suit or appeal is "transferable" when three conditions have been met. "First, the transferee court must have been able to exercise its jurisdiction on the date the notice of appeal was misfiled." *Kolek*, 869 F.2d at 1284. " 'Second, the transferer court must lack jurisdiction.' " *Id.* (quoting *Gioda v. Saipan Stevedoring Co.*, 855 F.2d 625, 629 (9th Cir.1988)). "Third, the transfer must serve the interests of justice." *Id.* We conclude that Rodriguez's petition for review satisfies all three conditions.

First, the BIA issued its decision on December 1, 1994, and Rodriguez filed his petition for review with the Eleventh Circuit on January 3, 1995, well within the ninety-day statutory period. *See* 8 U.S.C. § 1105a(a)(1). Accordingly, this court would have had jurisdiction over the petition if it had been filed with us then. *See* 28 U.S.C. § 1631; *Carpenter v. Department of Transp.*, 13 F.3d 313, 317 (9th Cir.1994) (stating that "we treat Carpenter's claim as if it were filed with this court on November 6, 1991, the date it was originally filed with the [transferor] court").

■ Second, for purposes of the transfer statute, a court lacks jurisdiction if venue does not lie. *See Dornbusch v. Commissioner of Internal Revenue Svc.*, 860 F.2d 611, 615 (5th Cir.1988) (per curiam) (holding that where a court has jurisdiction but lacks venue, it may transfer a case to a court of appeals of proper venue under the federal transfer statute or its inherent authority). A contrary construction would undermine the statutory purpose of eliminating "the risk of filing in the wrong court." *Dornbusch*, 860 F.2d at 614. Congressional intent is clear: " 'a case mistakenly filed in the wrong court [should] be transferred as though it had been filed in the transferee court on the date on which it was filed in the transferor court.' " *Alexander*, 825 F.2d at 501 (quoting 128 Cong. Rec. 3572 (1982)).

■ Last, a transfer of Rodriguez's petition serves the interests of justice. *See Kolek*, 869 F.2d at 1284. In *Kolek*, this court found transfer in the interests of justice where the appellant's "errant filing was caused in part by his pro se status, lack of fluency in English, and inability to access legal research materials in prison." *Id.* Here, Rodriguez, a refugee who lacks fluency in English, filed his pro se petition in the Eleventh Circuit in good faith. He did so relying on the mistaken advice of prior counsel, and when he learned of his mistake, he filed a petition for review with this court. This alone would be sufficient to meet the requirement. In addition, here, were we not to hear Rodriguez's petition, he would be time-barred from seeking review. *See Pearce v. Director, Office of Workers' Compensation Programs*, 603 F.2d 763, 771 (9th Cir.1979) (finding, under its inherent authority, that case should be transferred where petitioner's claims would probably be time-barred if the case were dismissed). That, too, would be sufficient, in itself. Finally, we may in cases that would otherwise qualify, decline to transfer if the petition or appeal is frivolous. *See Clark*, 959 F.2d at 814 ("Where no colorable claim for relief has been shown, transfer is improper."). Here, Rodriguez's claim is not only colorable; he is entitled to prevail on the merits. Were we not to deem his petition transferred, Rodriguez would be deported and face persecution in Cuba. In such circumstance, we would violate the purpose of the statute, with its interests of justice standard, if we failed to deem the petition transferred.

Accordingly, we deem Rodriguez's petition for review to have been transferred to this court and proceed to address the merits. *See Kolek*, 869 F.2d at 1284; *In re McCauley*, 814 F.2d at 1352.

## III

■ The principal issue in determining Rodriguez's eligibility for asylum and withholding of deportation is whether the punishment Rodriguez faces upon his return to

---

10. We intend no criticism of, or disagreement with, any rule or practice that may exist in the Eleventh Circuit with respect to the clerk's authority to return papers erroneously submitted to that circuit for filing.

Cuba constitutes "persecution." "The Act does not define 'persecution'; therefore, we must defer to the Board's interpretation unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'" *Fisher v. INS*, 79 F.3d 955, 961 (9th Cir.1996) (en banc) (citations omitted). In interpreting the term "persecution," however, the BIA is bound to *follow* applicable case law. *Id.* It is bound, for example, to *follow* this court's earlier decision in *Kovac v. INS*, 407 F.2d 102, 107 (9th Cir.1969). *Id.* It is also bound, as we explain shortly, to *consider* the principles established by the United Nations High Commissioner for Refugees in the *Handbook on Procedures and Criteria for Determining Refugee Status* (1979) (Handbook).

In rejecting Rodriguez's claim of persecution, the IJ and the BIA relied exclusively on the fact that Rodriguez had violated Cuba's laws in leaving the country and remaining abroad without authorization.[11] They acknowledged that there was a clear probability that Rodriguez would be prosecuted if he were returned to Cuba. They concluded, however, that Cuba's enforcement of its laws, no matter how severe the penalty or what the prohibited conduct, could not constitute persecution.[12] This interpretation of the term "persecution" is squarely inconsistent with court and BIA precedent addressing punishment for illegal departure as well as with the Handbook. We discuss the latter conflict first.

■ In deciding whether prosecution and incarceration for illegal departure can constitute persecution, we are guided by the Handbook, which is "published by the Office of the United Nations High Commissioner for Refugees ... for the purpose of providing guidance to governments about 'procedures and criteria for determining refugee status.'" *Canas–Segovia v. INS*, 902 F.2d 717, 722, 724 (9th Cir.1990) (quoting Handbook at 1), *vacated,* 502 U.S. 1086, 112 S.Ct. 1152, 117 L.Ed.2d 401 (1992), *on remand,* 970 F.2d 599 (9th Cir.1992). "Both the Supreme Court and this court have looked to the Handbook in determining refugee status, and consider it to be authoritative on the subject." *Id.*[13]

---

**11.** When the BIA has conducted a *de novo* review of the IJ's decision, our review is limited to the BIA's decision except to the extent that the IJ's opinion is expressly adopted. *Ghaly v. INS*, 58 F.3d 1425, 1430 (9th Cir.1995). When the BIA conducts an independent review of the record but affirms "based upon and for the reasons set forth" in the IJ's decision, we treat the IJ's statement of reasons as the BIA's and review the IJ's decision. *See Alaelua v. INS*, 45 F.3d 1379, 1382 (9th Cir.1995). Here, the BIA clearly adopted the decision of the IJ, affirming "based upon and for the reasons set forth in [his] decision." Accordingly, we review the IJ's decision. However, out of an excess of caution, because the BIA also wrote separately, we also review its decision, to the extent that it adds to the IJ's discussion.

**12.** With respect to the possibility of execution, the IJ offered two responses. First, he noted that while executions continue in Cuba, they have diminished in number. Second, he noted that execution is not uncommon for desertion or treason. *See supra* n. 6. He then concluded that the fact that death may be the punishment for illegal departure does not "serve as an expiation or propitiation for the criminal act, which was committed against the state, and in this case in particular, against the government of Fidel Castro." To put it bluntly, the IJ and the BIA (and thus the Attorney General of the United States, who possesses the statutory authority to make these decisions) were perfectly willing to send

Rodriguez back to his death if that were the punishment Cuba decided to mete out.

**13.** We have previously observed that

> [w]hile the United Nations Handbook is not binding on the INS, the Supreme Court has observed that it "provides *significant guidance*" in construing the United Nations Protocol Relating to the Status of Refugees, to which the United States acceded in 1968, and which Congress sought to follow in enacting United States refugee law.

*Ramos-Vasquez v. INS*, 57 F.3d 857, 863 (9th Cir.1995) (citations omitted) (emphasis added). The Fourth Circuit, following the lead of other courts in recognizing that the Handbook provides significant guidance in interpreting our asylum law, stated: "The Refugee Act of 1980 was passed to bring the law of the United States in conformity with the United Nations treatment of refugees, and codifies United States obligations as a state party to the United Nations Protocol Relating to the Status of Refugees, January 31, 1967 ... and the United Nations Convention Relating to the Status of Refugees, July 28, 1951 ... to which the United States is not a party, but which is incorporated in the Protocol...." *M.A. A26851062 v. U.S. I.N.S.*, 858 F.2d 210, 214 n. 3 (4th Cir.1988). The Department of Justice also "has noted the likelihood that Congress intended the standards within the UN Handbook to serve as an interpretive guide to the 1980 Refugee Act." *Canas–Segovia*, 902

We have followed the principles set forth in the Handbook in a number of earlier cases. *See, e.g., Ramos–Vasquez v. INS,* 57 F.3d 857, 863 (9th Cir.1995) (concluding that punishment for desertion could constitute persecution where the type of action with which the petitioner did not want to be associated is condemned by the international community); *Hernandez–Ortiz v. INS,* 777 F.2d 509, 516–517 (9th Cir.1985) (holding that persecution on account of political opinion includes opinions that the persecutor falsely attributes to the alien); *McMullen v. INS,* 658 F.2d 1312, 1319 (9th Cir.1981) (noting that refugees fleeing political persecution are often limited in the evidence they can submit to support their claims).[14]

The Handbook specifically addresses the question raised in this petition and the rule it sets forth is directly contrary to the legal conclusion reached by the IJ and the BIA. In a section interpreting the term "well founded fear of persecution," it explains whether, and under what circumstances, the "consequences of unlawful departure or unauthorized stay outside country of origin"

may constitute persecution. Handbook ¶ 61, at 16. Paragraph 61 reads:

> The legislation of certain States imposes severe penalties on nationals who depart from the country in an unlawful manner or remain abroad without authorization. Where there is a reason to believe that a person, due to his illegal departure or unauthorized stay abroad[,] is liable to such severe penalties[,] his recognition as a refugee will be justified if it can be shown that his motives for leaving or remaining outside the country are related to the reasons enumerated in Article 1 A(2) of the 1951 Convention [i.e., reasons involving race, religion, nationality, membership of a particular social group or political opinion]. . . .

*Id.*[15] Accordingly, an alien qualifies as a refugee under the Handbook if he can demonstrate that he would be subject to severe penalties for his illegal departure or unauthorized stay abroad and that he left or has remained abroad on account of race, religion, nationality, membership in a particular social group, or political opinion.[16]

F.2d at 724 n. 13 (citing *M.A. A26851062,* 858 F.2d at 214–15 n. 3) (citation omitted).

**14.** The Board has also looked to the Handbook for significant guidance in interpreting our asylum law. *Canas–Segovia,* 902 F.2d at 724–25 (collecting cases); *M.A. A26851062 v. U.S. I.N.S.,* 858 F.2d 210, 215 (4th Cir.1988) (same).

**15.** Although the United States is not a party to the 1951 Convention, the definition of refugee and the enumerated bases of harm adopted by Congress in our asylum law "are virtually identical to the definition of 'refugee' in the 1951 Convention." *Canas–Segovia,* 902 F.2d at 722 nn. 7 & 8.

**16.** The BIA's attempt to analogize illegal departure to desertion from military service is without merit. It ignores the Handbook's express treatment of punishment for illegal departure. It would be particularly ironic for the BIA or this court to disregard the Handbook's guidance regarding illegal departure and instead apply the rule regarding military desertion, *Barraza Rivera v. INS,* 913 F.2d 1443, 1450 (9th Cir.1990)—that punishment for desertion, per se, does not constitute persecution—when that rule and its exceptions were derived from the Handbook, *see Ramos–Vasquez v. INS,* 57 F.3d at 863; *Canas–Segovia,* 902 F.2d at 727; Handbook, ¶¶ 167–71, at 39–40. Accordingly, we reject the analogy to military desertion, and instead apply the rule

drafted with the precise circumstances before us in mind.

Likewise, the general rule—that prosecution for an act deemed criminal and made applicable to all of a country's citizens is not persecution—is inapplicable here. That rule and its exceptions were derived from the Handbook as well. *See Abedini v. INS,* 971 F.2d 188, 191–92 (9th Cir. 1992) (stating that persecution may be established where the generally applicable law as applied to the petitioner would be "especially unconscionable" or "merely a pretext to persecute him" on account of one of the enumerated grounds) (citing Handbook ¶ 85, at 20, which states that prosecution may be a pretext for punishing an offender for his political opinions and that a political offender may be exposed to excessive or arbitrary punishment, in which case the punishment will amount to persecution). As the Handbook's individual treatment of the crime of illegal departure makes clear, that crime is *sui generis* and should not be treated in the same manner as other crimes. To apply the rule regarding ordinary prosecutions in cases involving the crime of illegal departure would contradict the Handbook's individualized treatment of illegal departure. Moreover, we note that *Abedini* did not overrule *Kovac,* which, as we explain below, sets forth the separate rule for illegal departure that is now contained in the Handbook. Finally, in *Fisher,* we cited *Abedini* and *Kovac* together as illustrations of the precedent

■ Not only are the decisions of the IJ and the BIA in this case directly contrary to the principles set forth in the Handbook but they are also directly contrary to both court and BIA precedent. *Kovac v. INS*, 407 F.2d 102 (9th Cir.1969), *Sovich v. Esperdy*, 319 F.2d 21 (2d Cir.1963), and *In re Janus & Janek*, 12 I. & N. Dec. 866 (BIA 1968) are all cases that specifically address punishment for the crime of illegal departure. These cases, singly and collectively, stand for the proposition that punishment for the crime of illegal departure constitutes persecution when the punishment would be severe. *See also Coriolan v. INS*, 559 F.2d 993, 1000 (5th Cir.1977) ("If the immigration judge meant … to assert that prosecution for the offense of illegal departure can never amount to political persecution, his view was inconsistent with decisions both of the courts and of the INS itself.") (citing, among other cases, *Kovac* and *Janus & Janek*).[17]

In our *Kovac* case, the petitioner defected from Yugoslavia and sought asylum in this country. He argued that having done so, he would face a long confinement and be subjected to physical abuse if he were returned, because his action "'would be considered open defiance and denunciation of Communism.'" *Kovac*, 407 F.2d at 104. In concluding that the BIA erred in denying Kovac's claim for asylum, we stated that "Congress did not intend to make the United States a refuge for common criminals, but *it did intend to grant asylum to those who would, if returned, be punished criminally for violating a politically motivated prohibition against defection from a police state.*" *Id.* (emphasis added). We pointed to the BIA's determination that an alien was eligible for relief if he could show that his departure was politically motivated and that the consequences he would face, albeit as a result of criminal prosecution, were political in nature. *Id.* (citing *Janus & Janek*, 12 I. & N. at 876).

In so ruling, we were guided by *Sovich*, in which the Second Circuit held that the Attorney General had erred in ruling that imprisonment for illegal departure from a foreign country could never constitute persecution. In *Sovich*, the petitioner fled Yugoslavia and feared that, if returned, he would be punished for his illegal departure. The court began its analysis by noting that punishment following conviction for a crime cognizable under a recognized juridical system ordinarily does not constitute persecution. But, the court cautioned, "[t]he memory of Hitler's atrocities and of the legal system which he corrupted to serve his purposes … are still too fresh for us to suppose that physical persecution may not bear the *nihil obstat* of a 'recognized juridical system.'" *Id.* at 28.

Having found that punishment for some crimes could constitute persecution, the Second Circuit then addressed punishment for illegal departure and concluded that punishment for that crime, if severe, constitutes political persecution. It found that punishment for illegal departure was political in nature. It stated:

General prohibitions against departure from a country do not, of course, define traditional crimes in Western societies. They are the product of modern dictatorships able to control long borders and the movements of their people within them. …

Devotees of such regimes do not risk life and limb to violate statutes prohibiting

---

we must follow in cases in which there are prosecutions for violation of criminal law. *Fisher*, 79 F.3d at 961.

**17.** Although *Kovac*, *Sovich*, and *Janus & Janek* predate the Refugee Act of 1980, which established the current framework for asylum, they are nonetheless applicable to the determination whether under the Act punishment for illegal departure constitutes persecution. The Act did not define the term "persecution," and courts continue to employ the definition announced in *Kovac*. *See, e.g., Borca v. INS*, 77 F.3d 210, 215 (7th Cir.1996) (rejecting IJ's ruling that petitioner had not established economic persecution where the test he adopted was in conflict with the test set forth in *Kovac*). In fact, the BIA itself has concluded that Congress intended the Refugee Act to incorporate the pre–1980 definition of the term "persecution." *See In re Acosta*, 19 I. & N. Dec. 211, 222–23 (BIA 1985), *overruled on other grounds, In re Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987) (presuming that Congress intended to adopt the judicial and administrative construction of the term "persecution" existing prior to the Refugee Act of 1980); *see also In re Sanchez & Escobar*, 19 I. & N. Dec. 276, 284–85 (BIA 1985).

departure. It would be naive to suppose, therefore, that punishment for illegal departure, under these circumstances, is not politically motivated, or does not constitute punishment "because of . . . political opinion."

*Id.*[18] The court recognized, however, that not every punishment for illegal departure would constitute persecution, because "[h]owever repugnant to our own concept of justice, a *brief* confinement for illegal departure or for political opposition to a totalitarian regime would not necessarily fall within the ambit of Congress's special concern in enacting [§ 243(h)]." *Id.* at 29. Nonetheless, the court was "unwilling to believe . . . that Congress ha[d] precluded from relief . . . an alien threatened with long years of imprisonment, perhaps even life imprisonment, for attempting to escape a cruel dictatorship." *Id.* "Such a construction of the statute," the court concluded, "would attribute to Congress an insensitivity to human suffering wholly inconsistent with our national history." *Id.*[19]

The BIA itself has likewise recognized that punishment for illegal departure can constitute political persecution. In *Janus & Janek*, which we also relied on in *Kovac*, the BIA found that both petitioners were entitled to withholding of deportation. Both had been convicted *in absentia* for leaving Czechoslovakia illegally; Janus had been sentenced to a one-year term of imprisonment and his property had been confiscated, while Janek had been sentenced to eight months in prison. The BIA recognized that "[t]he act of defection normally has political, rather than criminal connotations." *Janus & Janek,* 12 I. & N. Dec. at 873. Of Janus, it stated:

> Jaroslav Janus left Czechoslovakia because of his disagreement with the Communist system; he left with the intention of never returning. . . . He is genuinely afraid of reprisals by the Czech government if he should be forced to return, not simply because he has remained away longer than authorized, but because he, a member of the Communist Party in good standing, entrusted with the mission of propagandizing for the Communist government in the United States, showed his true political sentiments by defecting. The punishment imposed upon him by the Czech court . . ., including not only the sentence to imprisonment but, on his very first offense of any kind, the confiscation of all his property; the severity with which that confiscation was carried out . . .; the concern . . . with defection from the Republic, and with the denigration of the good name of the Czechoslovak Republic; all of these factors persuade us that what would await Jaroslav Jan[us] upon his return to Czechoslovakia would *not be punishment for violation of an ordinary criminal statute* . . ., *but persecution for the political offense which he has committed against the State.*

*Id.* at 875 (emphasis added). The BIA therefore recognized that a petitioner who, having fled his native country for political reasons, faces severe punishment for the crime of illegal departure should not be deported to that country.[20]

---

18. The Universal Declaration of Human Rights, Article 13(2), provides that "[e]veryone has the right to leave any country, including his own, and to return to his country." *Basic Documents on Human Rights* 24 (Ian Brownlie ed., 1992).

19. In *Henry v. INS*, where the petitioners "alleged that anyone who had fled the regime of 'Papa Doc' Duvalier, as they had, would be received with hostility by the present government," the court stated that, if proven, "such an allegation might form a sound basis for fear of persecution. . . ." 552 F.2d 130, 131 (5th Cir.1977). Because it concluded that the petitioners had failed to substantiate their allegation, however, the court affirmed the denial of their claims for withholding of deportation. *Id.* at 131–32. *See Berdo v. INS*, 432 F.2d 824, 847 (6th Cir.1970)

(concluding that petitioner was entitled to withholding of deportation, in part, because he would be subjected to substantial economic disadvantage as a defector).

20. In *In re MacCaud*, 14 I. & N. 429 (BIA 1973), the BIA relied on the principles established in *Janus & Janek*. It denied relief to a petitioner who failed to establish that he "was politically motivated in leaving Canada" or that the prosecution he would face in Canada was "politically motivated." The BIA has since relied on *Janus & Janek, see In re Williams*, 16 I. & N. 697, 700 (BIA 1979), most recently in *In re Acosta*, 19 I. & N. Dec. 211, 222 (BIA 1985), *overruled on other grounds, In re Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987), and has never overruled it.

■ Following court and BIA precedent, as well as the Handbook provision on punishment for illegal departure, we conclude that the IJ and the BIA erred as a matter of law in determining that aliens who face punishment for the crime of illegal departure cannot establish persecution within the meaning of the statute. The two opinions fail to cite a single case involving illegal departure, ignore the circuit cases holding that punishment for illegal departure may constitute persecution and its own decision to that effect in *Janus & Janek,* and fail to mention, let alone consider, the Handbook.[21] In short, the IJ and the BIA simply concluded, arbitrarily and capriciously, that because a Cuban statute was violated, the punishment Rodriguez faced constituted prosecution rather than persecution. Freed from the governing legal principles by its failure to acknowledge the applicable cases, the IJ and the BIA treated the offense of illegal departure as if it were no different from ordinary criminal conduct.[22] On the basis of that erroneous determination, they concluded that punishment for leaving the country illegally could not constitute persecution. We hold that the IJ's and the BIA's interpretation is manifestly contrary to the statute and arbitrary and capricious. *See Fisher,* 79 F.3d at 961. In doing so, we echo the words written by Judge Harold Medina some thirty-odd years ago:

I do not see how the rulings of the Special Inquiry Officer and the Regional Commissioner can mean anything other than that imprisonment for illegal departure may never constitute "physical persecution." If this is so, the construction thus given to the statute is not only utterly repugnant to our national traditions and history, it is also patently inconsistent with the intention of Congress in enacting Section 243(h). A decision based upon such a misreading of the law must necessarily be capricious and arbitrary.

*Sovich,* 319 F.2d at 30 (Medina, J., concurring).

The law in this circuit remains as it was when laid down in *Kovac.* The interpretation we reaffirm today incorporates the principles set forth in *Sovich,* the BIA's decision in *Janus & Janek,* and the Handbook. A petitioner may establish persecution within the meaning of the statute if he can show that he left or remained away from his homeland for political reasons and that, if returned, he would be subject to severe punishment, whether as the result of criminal prosecution or otherwise.

**IV**

■ Although neither the IJ nor the BIA mentioned the case in their decisions, the government now contends that *INS v. Elias–*

21. Except for mentioning *Sovich* in a vain and twisted effort to distinguish it, the government in its brief before this court also fails to cite any case law involving illegal departure, let alone any case law disavowing the legal principles that have consistently been applied since *Sovich.*

22. Because Rodriguez not only illegally departed Cuba but also deserted his merchant ship, the BIA appears to suggest that he would face punishment for an ordinary crime rather than a political one. We reject any such argument. Although Rodriguez's abandoning his merchant marine assignment may constitute a separate offense under Cuban law, that offense is subsumed within and inextricably intertwined with the offense of illegal departure. Indeed, because its punishment may serve the identical purposes as punishment for illegal departure or defection, and indeed may punish the same physical act, ship-jumping may in appropriate circumstances be viewed as merely a particular form of those offenses. In *Kovac,* where a seaman had deserted his ship and therefore faced prosecution for violations of Yugoslavian law, we equated punishment for desertion with punishment for "violating a politically motivated prohibition against defection." 407 F.2d at 104. We said that the question was whether the consequences were political in nature regardless of the "form" of the criminal statute. We see no reason to deem Rodriguez ineligible for refugee status simply because he left Cuba illegally by jumping ship. Nor would we deny him relief if he left an oppressor nation by automobile and were subject not only to prosecution for illegal departure but also for driving without a license.

The government in its brief contends that this case involves not only the crimes of illegal departure and desertion, but also the crime of treason. We need not respond at length to this argument. It should suffice to say that punishment for illegal departure may constitute persecution whether the offense is labelled as "treason" or "jaywalking." Whatever the nomenclature, the offense is still that the person has left the country contrary to the sovereign's mandates.

*Zacarias,* 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) requires a different result. Its argument is incorrect. Our holding fully comports with the requirement in *Elias–Zacarias* that an asylum applicant establish his persecutor's motive—that he show that he would be persecuted on account of his political opinion. *Id.* at 483, 112 S.Ct. at 816–17. The Second Circuit stated the proposition unequivocally: "It would be naive to suppose ... that punishment for illegal departure ... is not politically motivated, or does not constitute punishment because of ... political opinion." *Sovich,* 319 F.2d at 28.[23] Because the crime is intended to punish those who exhibit a grave form of disloyalty to their homeland, we simply acknowledge here what should by now have been apparent to all: that a state which severely punishes unlawful departure views persons who illegally leave as disloyal and subversive and seeks to punish them accordingly. Thus, the motive that a petitioner must show on the part of the state is initially established on the face of a statute that criminalizes illegal departure. To put it in different terms, the statute imputes to those who are prosecuted pursuant to it, a political opinion that the state believes warrants an extreme form of punishment.[24]

■ While an applicant who has shown that he would face severe punishment for the crime of illegal departure might appear on that basis alone to have established persecution on account of political opinion, the cases that dictate our result and the Handbook have applied a more stringent test. Relief has not been granted solely on the basis of the persecutor's motive to punish on account of political opinion. Instead, the petitioner must prove that he is one of the persons at whom the illegal departure statute was directed—persons who flee their homeland for political reasons. *See Kovac,* 407 F.2d at 104 (stating that an alien must show " 'that his departure was politically motivated and that any consequences he faces on return are political in nature' ") (quoting *Janus & Janek,* 12 I. & N. at 876); *Janus & Janek,* 12 I. & N. at 876 ("A person whose departure from a [ ] ... country is devoid of political motivation ... is not entitled to [relief] on the basis that he may face criminal prosecution for overstay."); Handbook ¶ 61, at 16 (requiring that alien leave the country or remain abroad on account of political opinion or one of the other enumerated grounds to establish persecution on the basis of punishment for illegal departure). Thus, severe punishment is deemed to be persecution only when the petitioner left his country or remained abroad *and* would face severe punishment for illegal departure.

## V

■ Having determined that an asylum applicant who left his country because of his political opinions and who faces severe punishment for the crime of illegal departure has established that he is subject to persecution on account of political opinion, we now apply these principles to Rodriguez's case. We consider his petition first under the more stringent clear probability of persecution

**23.** While a state may well be motivated by more than one motive in criminalizing and punishing illegal departure, it is sufficient that one of its motives is "on account of political opinion." *See Singh,* 63 F.3d at 1509 ("[T]he BIA failed to recognize that persecutory conduct may have more than one motive, and so long as one motive is one of the statutorily enumerated grounds, the requirements have been satisfied."); *accord Osorio v. INS,* 18 F.3d 1017, 1028 (2d Cir.1994) (interpreting the Immigration and Nationality Act to mean that " 'persecution on account of the victim's political opinion,' does not mean persecution solely on account of the victim's political opinion"). One of the motives, if not the primary motive, in severely punishing the crime of illegal departure is on account of political opinion. In this respect, the crime of illegal departure is entirely different from other crimes.

**24.** "Imputed political opinion is still a valid basis for relief after *Elias–Zacarias.*" *Canas–Segovia,* 970 F.2d at 601. *See Singh v. Ilchert,* 69 F.3d 375, 379 (9th Cir.1995) ("Because the police imputed to Singh the beliefs of the Sikh separatists and harmed him on that basis, the punishment was inflicted with a political motive."); *Singh,* 63 F.3d at 1509 (concluding that alien who was suspected of being a militant Sikh and tortured as a result was persecuted on account of imputed political opinion); *Desir v. Ilchert,* 840 F.2d 723, 729 (9th Cir.1988) ("We must view Desir as possessing a political opinion because his persecutors, the Ton Ton Macoutes, both attributed subversive views to Desire and treated him as subversive.").

standard for withholding of deportation, because if it can meet this standard, it *a fortiori* meets the less stringent standard for asylum. Given the decision of the IJ, which the BIA adopted, there can be no doubt that Rodriguez has established that he left Cuba on account of his political opinions and that he faces a clear probability of punishment for the crime of illegal departure. The IJ expressly found that Rodriguez left because of his political opinions and that he faces a clear probability of prosecution (and we may safely assume conviction). Therefore, the only remaining question is whether the punishment he would likely suffer is "severe."

The IJ labelled the punishment that Rodriguez would face as "harsh, if not fatal." We find that this conclusion is fully supported in the record. Rodriguez presented compelling evidence that the term of imprisonment he would face for illegal departure would be prolonged, possibly as long as twenty years, and that he could face death.[25] Indeed, as we noted earlier, the IJ and the BIA expressly acknowledged the possibility of death as a punishment, and stated that this did not affect their analysis. Thus, we conclude that Rodriguez established a clear probability that he would face severe punishment for the crime of illegal departure.

The State Department's report that the sentence for persons convicted of unlawful departure from Cuba is likely to be three years does not alter our analysis. Three years in prison for having left one's country is under the case law undeniably a severe

sentence which is sufficient to qualify as persecution. *Cf. Kovac,* 407 F.2d at 107 (defining persecution to include "suffering or harm upon those who differ . . . in a way regarded as offensive"); *In re Acosta,* 19 I. & N. 211, 222 (BIA 1985), *overruled on other grounds, In re Mogharrabi,* 19 I. & N. Dec. 439 (BIA 1987) (holding that "suffering or harm" could "consist of confinement or torture"). Indeed, in *Janus & Janek,* the BIA found that a year-long sentence was sufficiently severe to constitute persecution. In contrast, as the Second Circuit concluded in *Sovich,* a brief confinement for illegal departure, although "repugnant to our own concept of justice," would not fall within the ambit of persecution. 319 F.2d 21.[26]

Finally, we note that the sentence becomes all the more severe when we consider the treatment Rodriguez would likely face in jail. The record establishes that given the relatively privileged status Rodriguez enjoyed in Cuba, including the privilege of travelling abroad, his "crime" of illegal departure would be considered a treasonous act and he would be labelled a "traitor." As a result, Rodriguez would likely face particularly harsh conditions of imprisonment, including, among other things, cell assignments with the most unstable and violent of inmates, and the denial of medical care. Moreover, he might, like others before him, simply "disappear." The evidence regarding the conditions Rodriguez would likely face in prison and the possibility of his execution is uncontroverted.[27]

---

25. Because neither the IJ nor the BIA expressed any opinion as to Rodriguez's credibility, we presume that they found Rodriguez to be a credible witness. *See Platero–Cortez v. INS,* 804 F.2d 1127, 1131 (9th Cir.1986) ("When the IJ and the BIA have not made any findings regarding the petitioner's credibility, we presume they have found the petitioner's testimony credible."). Rodriguez's testimony was corroborated by two former political prisoners, whose testimony was also apparently accepted as credible.

26. The facts before us stand in stark contrast to those in *Li v. INS,* 92 F.3d 985 (9th Cir. 1996). In *Li* there was no contention that the petitioner left China because of his political opinions. Instead, Li relied on the fact of his departure alone. Thus, he clearly could not meet the test for persecution we discuss above. (Likewise, in the BIA case cited in *Li, In re Sibrun,* 18 I. & N. 354

(BIA 1983), there was no contention that the petitioner left for political reasons.) Moreover, the court in *Li* found that the petitioner's claim that he would be subject to severe punishment and torture for the crime of illegal departure was unfounded. It stated that persons who had illegally departed were subjected to a brief initial detention and a fine, but that there was no evidence that such persons had been subjected to criminal imprisonment or any other form of severe punishment. *Id.* at 988. For these reasons, we find *Li* to be entirely consistent with the rule set forth in *Kovac, Sovich, Janus & Janek,* and the Handbook.

27. As we have explained, the general rule regarding prosecution for ordinary criminal offenses is inapplicable in the context of the crime of illegal departure. However, even if we were required to treat the crime of illegal departure in the same

## CONCLUSION

For the reasons stated, we GRANT the petition for review, VACATE the BIA's denial of withholding of deportation and asylum, with instructions that Rodriguez be granted withholding of deportation, and REMAND for a determination in the exercise of the Attorney General's discretion as to whether he is entitled to asylum.

PETITION GRANTED; VACATED and REMANDED.

KOZINSKI, Circuit Judge, concurring.

Judge Reinhardt's opinion, with which I generally agree, demonstrates the importance of independent judicial review in an area where administrative decisions can mean the difference between freedom and oppression and, quite possibly, life and death.

What happened in this case at the administrative level is chilling. Rodriguez, a refugee from Communist Cuba, established that, if returned to his country, he might be shot, imprisoned for many years or simply made to "disappear." These are not fantasies. Communist countries are known for their brutality in stemming emigration; this brutality is inevitable because Communism so undermines human dignity and economic prosperity that any Communist country that opened its borders would soon be depopulated. Vicious punishment for emigration offenses is thus a means of enforcing political allegiance to governments unable to inspire loyalty by more conventional means.

None of this is new or controversial; the West has known of this seamy practice at least since the early 1960's, when East Germany was first observed shooting its citizens for trying to scale the Berlin Wall.

Where the Immigration Judge and the BIA went astray is in accepting the Newspeak used by the Cuban government to camouflage its atrocities. Rather than admitting that it must cling to its own citizens by brute force, the Cuban government adopts the fairy tale that its citizens, with the exception of a few "traitors" and "deserters," are happy to live under Communism. In so doing, the Cuban government co-opts the use of those terms and subverts them to its own nefarious ends.

Treason, as that term is commonly understood, involves betrayal of one's country by disclosing national security secrets to its enemies or otherwise giving them material aid and comfort, especially in time of war. "Desertion" involves leaving one's military post in time of war. Rodriguez carried away no military secrets; he did not abandon a combat post; he did not attempt to undermine the Cuban government in any way. All Rodriguez wanted was a chance to live his life, and raise his family, in a place where the government serves the people, not vice versa.

Against this backdrop—which should be self-evident to anyone who has lived through the Cold War—the IJ's discourse on how Cuba's repressive laws are of a mold with the practice of civilized nations is nothing short of bizarre. The judge stated:

> In socialist Cuba illegal exit, desertion and treason are all crimes. The latter two are also crimes in the United States.... Certainly, any government when it passes laws has a political objective as part of the motivation for the statute. I have no doubt that the laws which the respondent violated in Cuba were, in part, politically motivated for reasons best known to the government of Fidel Castro. However, in

manner as a run-of-the-mill criminal offense, we would reach the identical result we reach here. Rodriguez has satisfied one of the specific exceptions to the general rule. *Abedini v. INS,* 971 F.2d 188, 191–92 (9th Cir.1992). That exception applies "where a petitioner can show that he will be subject to a disproportionately severe punishment on account of one of the five enumerated grounds." *Li v. INS,* 92 F.3d at 988 (9th Cir. 1996). Here, as discussed in the text, Rodriguez has shown that he would be subjected to even more severe punishment on the basis of political opinion than would the ordinary person pun-

ished for the identical offense. In addition, the experience of Rodriguez's family strongly supports the conclusion that Rodriguez would face persecution rather than prosecution were he returned to Cuba. *See Estrada v. INS,* 775 F.2d 1018, 1021–22 (9th Cir.1985) ("The absence of harassment of an alien's family tends to reduce the probability of persecution."); *see also Mendez–Efrain v. INS,* 813 F.2d 279, 282 (9th Cir. 1987) (noting that petitioner provided no evidence of threats, harassment or violence against his family); *Chavez v. INS,* 723 F.2d 1431, 1434 (9th Cir.1984).

my opinion that does not mean that these laws become unenforceable as political persecution.

. . . .

The Court will concede that sentences [for treason and desertion] appear to be harsh in Cuba[;] however, the Court is also mindful of the fact that our own government has imposed the severest of sentences for desertion in war time upon deserters of its military service. For example, during the closing stages of World War II and at the direction of no less a figure than General of the Army and later to be President Dwight David Eisenhower, Private Slovik was executed for desertion. He was sent before a firing squad with Eisenhower's approval.

It is true from the literature that executions continue in Cuba today. They have, however, in later years diminished. Nevertheless, this Court cannot take on the burden of assessing criminal penalties in a foreign country in the guise of political persecution. The penalty for treason has always been severe. For example, in 17th Century England, the penalty for treason[,] which generally was an assault upon the monarch, was hanging, drawing and quartering. That, be it remembered, was in a civilized country.

Supplementary Oral Decision of the Immigration Judge, Aug. 9, 1990, at 5–7.

I do not mean this as a general indictment of the INS, an agency of the United States Government toward which I feel respect and gratitude. When my family and I arrived in this country—also refugees from Communism—we were treated by the INS with dignity and compassion. I believe that the great majority of those who deal with the agency have similar experiences. But agencies are run by people and people make mistakes. Review by a tribunal outside the agency helps correct these rare but tragic errors. In the case of Rodriguez, this may mean the difference between life and death; the effort is surely worth the candle.

REINHARDT and HAWKINS, Circuit Judges, specially concurring.

Judge Kozinski's concurrence contains much that is personal and that reflects his experience as an immigrant who came to this nation in order to seek freedom and a better way of life. The concurrence focuses on a particular form of authoritarianism with which Judge Kozinski is most familiar. Given the circumstances of this case, it is certainly appropriate for him to express his own individual views on the subjects of Communism and the Cuban government in a separate concurrence.

There is one part of the concurrence, however, which is not personal and which we feel compelled to join. Judge Kozinski emphasizes "the importance of independent judicial review" in asylum cases. We agree wholeheartedly. In the absence of judicial review, grave injustices could take place for which our government and our people would have to bear the moral responsibility. These injustices might, as Judge Kozinski suggests, ordinarily be few in number, but, in some periods of history they could be many indeed.

Those of us who are familiar with the infamous episode in which we turned away hundreds, if not thousands, of Jewish refugees crowded on the decks of the Saint Louis, many of whom subsequently perished in Hitler's concentration camps, understand the importance of treating the problem of political and religious refugees with sensitivity, compassion, and care. On some occasions, government agencies may not take the most objective view of particular cases, for reasons ranging from partisan or political concerns or biases to the human consequences of an unmanageable or overburdensome caseload. Courts may err also, but the additional level of review is a safety mechanism designed to catch at least the most egregious of the inevitable human errors.

As Judge Kozinski's concurrence makes clear, judicial review of asylum cases may mean the difference between life and death for refugees from tyranny or from religious or racial persecution. As a nation that proclaims its strong belief in the importance of human life and political freedom for all peoples, that should be enough to persuade us of the necessity of judicial review.