**Teresita Moral BORJA, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 97–70272.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 22, 1998.

Filed April 30, 1999.

Robert B. Jobe, Hilary A. Han, Law Offices of Robert B. Jobe, San Francisco, California, for petitioner Teresita Moral Borja.

Donald E. Keener, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for respondent Immigration and Naturalization Service.

Before: HUG, Chief Judge, and BROWNING, SCHROEDER, PREGERSON, REINHARDT, O'SCANNLAIN, TROTT, KLEINFELD, HAWKINS, THOMAS, and SILVERMAN, Circuit Judges.

Opinion by Judge TROTT; Dissent by Judge O'SCANNLAIN.

TROTT, Circuit Judge:

The New People's Army ("NPA") is a violent, revolutionary Communist group which actively opposes the Philippine government. The NPA has a well-documented history of political violence, including the murder of its opponents. The 1995 Country Profile issued by our State Department says that "the NPA . . . is known to engage in killings and other violence."

In testimony found by an immigration judge to be credible, consistent, forthright, and "sincere in all respects," petitioner Teresita Moral Borja related a series of hostile encounters with the NPA in Manila in her native Philippines. She argues that her unchallenged testimony compels the conclusion that the NPA persecuted her, and that they did so-at least in part-on account of her political opinion; and she maintains that this persecution qualifies her under our laws for political asylum. Because we agree with her analysis of the compelling effect of her evidence, we grant this petition for review.

## I

On September 22, 1992, armed NPA operatives confronted Ms. Borja while she was working in her parents' business and shoe factory. These men were interested in accomplishing two related objectives.

First, they asked Ms. Borja to join and support their organization. She refused, telling them she was "pro-government" and that she would not enlist. Because the facts of this confrontation are essential to our conclusion, we quote verbatim from her testimony:

Q. (By Attorney Gadda) What happened after [you told them you were pro-government and refused to join]?

A. (By Ms. Borja) They get mad at me. They pointed a gun at me and then I *thought they were going to kill me because I argued with them that I don't want their, I don't their organization* because they kill people, women and children and they get mad and I thought they were going to kill me. *They pointed a gun at me and I told them just that I will pay taxes if I needed to so that they would not kill me.* (emphasis added)

The NPA responded by demanding 3,000 pesos from her as "revolutionary taxes":

Q. (By Mr. Thompson for the INS) Did they ask (sic) you for money after you turned down-you refused to join them?

A. (By Ms. Borja) Yes.

Q. And that amount was 3,000 pesos?

A. Yes.

Q. Did you pay them the 3,000 pesos immediately?

A. Yes, I did.

The men left, telling her they would return monthly for another payment and that she would be killed if she called the police or the "authorities," apparently meaning the military. The men surfaced every month to collect on their demands. Ms. Borja believed they were armed on each occasion.

In February 1993, the NPA doubled its demand to 6,000 pesos. When Ms. Borja said she did not have that amount of money and could not pay, the NPA agents became angry, beat her, put a gun to her head, and slashed her with a knife. This wound left a scar which she displayed on request to the immigration judge at her hearing. After suspending their attack, the men departed, telling her they would murder her if she didn't get the money. In short order, Ms. Borja sought medical treatment (including stitches for her arm), moved out of her house, went into hiding ("I was so scared that any time they might find me and kill me"), and sought a visa to flee the country.

At her hearing, her attorney asked her if she was aware of the recent amnesty the government supposedly had arranged with the NPA. She acknowledged the arrangements, but said, "it's not working because the rebels ... wouldn't agree to conditions." Her attorney then asked her if she had considered moving to another part of the Philippines to escape the NPA's threat. Her considered response was, "No, because the NPAs are everywhere and they have this vast network of intelligence and they can find people." She concluded her testimony with this plea: "I would like to beg Your Honor to please let me stay in this country because if I go back, I am sure they will kill me."

## II

In the posture that this case comes to us, we must answer one central question: Does the evidence Ms. Borja presented to the BIA compel the conclusion that the NPA subjected her to persecution on account of her political opinion under the Immigration and Nationality Act. 8 U.S.C. §§ 1101(a)(42)(A) (West Supp.1998).[1] *See INS v. Elias–Zacarias*, 502 U.S. 478, 479, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). An answer in the affirmative entitles her to eligibility for asylum. The BIA's contrary determination "can be reversed only if the evidence presented by [Ms. Borja] was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *Id.* at 481, 112 S.Ct. 812. However, as the Second Circuit observed in *Osorio v. INS*, 18 F.3d 1017, 1028 (2d Cir.1994), "[t]he plain meaning of the phrase 'persecution on account of the victim's political opinion,' does not mean persecution *solely* on account of the victim's political opinion. That is, the conclusion that a cause of persecution is economic does not necessarily imply that there cannot exist other causes of the persecution." As the United Nations' *Handbook on Procedures and Criteria for Determining Refugee Status* says, "[W]hat appears at first sight to be primarily an economic motive for departure may in reality also involve a political element, and it may be the political opinions of the individual that expose him to serious consequences, rather than his objections to the economic measures themselves." *Osorio*, 18 F.3d at 1029 (quoting U.N. Handbook at §§ 62–64).[2] To quote

---

1. The NPA is not the government of the Philippines. Nevertheless, persecution cognizable under the Act can emanate from sections of the population that do not accept the laws of the country at issue, sections that the government of that country is either unable or unwilling to control. *See Korablina v. INS,* 158 F.3d 1038, 1044 (9th Cir.1998); *Sangha v. INS,* 103 F.3d 1482, 1487 (9th Cir.1997).

2. The U.N. Handbook "provides significant guidance in construing the 1967 United Nations Protocol Relating to the Status of Refugees, to which Congress sought to conform." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 439 n.

the Board's decision in this case, "An applicant for asylum need not show conclusively why persecution occurred in the past or is likely to occur in the future. However, the applicant must produce evidence from which it is reasonable to believe that the harm was motivated, at least in part, by an actual or implied protected ground." *In re T–M–B–*, Interim Dec. No. 3307 (BIA Feb. 20, 1997). *See also Singh v. Ilchert*, 63 F.3d 1501, 1509–10 (9th Cir. 1995) ("Persecutory conduct may have more than one motive, and so long as one motive is one of the statutorily enumerated grounds, the requirements have been satisfied.").

### III

■ Given this test, we conclude that Ms. Borja's undisputed testimony compels the conclusion that she was persecuted by the NPA, at least in part, on account of her political opinion. In contrast to the record in *Elias–Zacarias*, which did not contain *any* clear evidence of the guerillas' motive, either direct or circumstantial, Ms. Borja articulated her political opposition to the NPA as the reason for her refusal to join. We know that the NPA agents acted in direct response to her statement of political opposition and revulsion at their methods because their immediate reaction was to "get mad" and point a gun at her. When Ms. Borja saw their anger at her vocal resistance, she thought they were going to kill her at that very moment. The record shows that *she* interrupted that distinct possibility by changing the subject to their demand for money: "They pointed a gun at me and I told them just that I will pay taxes if I needed to so that they would not kill me." Under these telling circumstances, we believe that no reasonable fact-finder could fail to see the role her outspoken political opinion played both then and thereafter in what happened to her at the hands of the NPA. We agree with the Board's majority in their en banc opinion that she demonstrated "economic extortion," but we find no support for their conclusion that the extortion was exclusively "non-political." With all respect to the majority of the divided Board, Member Rosenberg's analysis in dissent is correct: "The case before us is an example of what we might call 'extortion plus.'" Had she not interjected her willingness to pay, the evidence strongly suggests that the NPA would have taken her life as a response to her political statement. Quite possibly, other NPA episodes of robbery and extortion have been purely economic in nature, but this one clearly had mixed motives.

We note that Ms. Borja did not waver from her political refusal to join the NPA, remaining in their eyes their political adversary. Once Ms. Borja drew a political line in the sand, her every contact with the NPA became a life or death situation, and the probability of death became almost certain in February 1993, when she could not and did not pay her "taxes." As the immigration judge wrote in his decision,

> The NPA members then became angry and started slapping and hitting [Ms. Borja]. One of them threatened her with a gun. The other took out a knife and cut her right shoulder and/or right arm area. They also told her that they would be back and that she was to have the money ready when they returned; if not she would be killed.

Printed Oral Decision of the Immigration Judge, August 8, 1995.

Wounded and no longer able to buy her life with money as she had in September, no reasonable person could doubt the sincerity and validity of her fear of immediate death at the vengeful hands of her political enemy, fear that drove her from her home and into hiding. Had she joined the NPA's cause, it is unreasonable to assume they would have slashed her shoulder and drawn her blood when she

22, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). *See also Rodriguez–Roman v. INS*, 98 F.3d

416, 425 n. 13 (9th Cir.1996).

could not produce 6,000 pesos on demand. The evidence viewed as a whole compels the inescapable conclusion that the harm and continuing death threats the NPA inflicted upon Ms. Borja were motivated not just by an isolated desire for money, but in fact were triggered by her initial hostile political confrontation with its agents. There is no substantial evidence in the record to the contrary. Only by closing one's eyes to the escalating nature of this confrontation could one see the ensuing events as strictly economic with no political component. The connection drawn by Ms. Borja between her political confrontation with the NPA and their hostile treatment of her has the unmistakability of a dinosaur in a haystack.[3] As in the case of *Lazo–Majano v. INS*, 813 F.2d 1432, 1434 (9th Cir.1987), the fact that she surrendered initially to their demands "does not alter the persecutory character of her treatment." In February 1993, when she could not pay, the NPA took up where it had left off in September and escalated its pressure with life-threatening violence: words turned to wounds.

This is not the first time we have concluded that beatings and assaults for the purpose of financial extortion constitutes persecution on account of political opinion. In *Desir v. Ilchert*, 840 F.2d 723, 725 (9th Cir.1988), petitioner Desir was arrested, threatened, and assaulted by Haitian Ton Ton Macoutes because he refused to pay bribes in return for fishing privileges. The BIA rejected his asylum request because he "had not shown that his refusal to pay the bribes was an expression of political opinion" or that the Macoutes interpreted his failure to pay as politically motivated. *See id.* On the facts, we disagreed with the BIA, noting that "the treatment endured by Desir is more properly understood as motivated by 'political' rather than 'personal' interests." *Id.* at 728. Our conclusion in *Desir* was fueled, as it is here, by an understanding of the context of the refusal to submit to the aggressors'

demands. We said, "Desir's refusal to accede to extortion in a political system founded on extortion resulted in his classification and treatment as a subversive." *Id.* at 727.

The factual setting that Ms. Borja brings to us is similar to the plight of the petitioner in *Gonzales–Neyra v. INS*, 122 F.3d 1293 (9th Cir.1997), *as amended*, 133 F.3d 726 (9th Cir.1998). In that case, Gonzales–Neyra was first approached anonymously by the Peruvian Shining Path as "a target for money because he was a successful businessman." *Id.* at 1296. When he discovered their political identity, he rejected their demands and told them he did not support their revolutionary armed struggle against the government. In response, the guerrillas threatened to kill him.

The BIA concluded that Gonzales–Neyra failed to establish his eligibility for a grant of asylum. Over the government's opposition, we concluded that he was eligible, and we granted his petition for withholding of deportation, saying,

> The government's focus on the Shining Path's economic motivation for the extortion demands is misplaced, as was the immigration judge's and the BIA's.... Thus, the fact that the guerrillas may have initially chosen Gonzales–Neyra as a target for money because he was a successful businessman, does not relate to their subsequent motivation for persecuting him. The persecution of which Gonzales–Neyra complains is not the extortion, but the threats upon his life and business that were made after the guerrillas learned of his political orientation.

*Id.* at 1296.

## IV

Because Ms. Borja has demonstrated that she suffered past persecution, she is entitled to the legal presumption that she has a well-founded fear of future persecution. *See* 8 C.F.R.

---

**3.** Stephen Jay Gould, *Dinosaur in a Haystack*

(1995).

§ 208.13(b)(1)(i); *Prasad v. INS*, 101 F.3d 614, 617 (9th Cir.1996). In order to rebut this presumption, the INS must show by a preponderance of the evidence that conditions in the Philippines have changed to such an extent that Ms. Borja no longer has a well-founded fear that she would be persecuted, should she return there. *See id.* To rebut this presumption, the INS invokes our State Department's 1995 Profile of Asylum Claims and Country Conditions regarding the Philippines. The INS highlights the Profile's description of an amnesty program; an NPA declining in numbers and geographical presence; an NPA that "in most instances"-but implicitly not all-is not interested in the political opinion of its victims, but in their wealth; and that *"generally* [it is] possible to seek internal resettlement" in cases with credible threats. (emphasis added).

What the INS does not highlight is the Profile's unreassuring statements that there are "fewer" disappearances and politically-related killings, and that peace talks involving the NPA were "adjourned indefinitely" in 1994 because of "dissension." The report also says the number of "NPA instigated killings in recent years" is "declining." This information leads us to conclude that, although the current tide of violence may be receding, based on this record it still exists. The Profile says also that some asylum claimants try to distance themselves from the NPA, and that those claimants may be aware that "if they do not distance themselves from the NPA, which is known to engage in killings and other violence, they may risk having their applications denied on the grounds that *they themselves engaged in persecution."* (emphasis added). The Profile continues with an acknowledgment that one faction of the NPA targets "business figures for vigilante-style assassinations as 'enemies of the people.'" Ms. Borja would appear to be a "business figure."

Reading the Profile in its entirety gives us no sense whatsoever that Ms. Borja does not have a reason to fear death at the hands of the NPA. In fact, the Profile fully corroborates Ms. Borja's testimony that the NPA is a dangerous group that murders people who oppose them. This conclusion leads us to our second problem with the country conditions information: the BIA failed to apply the relevant facts in the Profile to the specific threat faced by Ms. Borja. "Our cases hold that 'individualized analysis' of how changed conditions will affect the specific petitioner's situation is required. Information about general changes in the country is not sufficient." *Garrovillas v. INS*, 156 F.3d 1010, 1017 (9th Cir.1998). The BIA erred as a matter of law in failing to do the requisite analysis. For these reasons, the presumption that Ms. Borja has a well-founded fear stands unrebutted.

### V

We conclude that Ms. Borja (1) did suffer past persecution and (2) that she has convincingly shown a genuine and well-founded fear of future political persecution should she return to the Philippines. Under these circumstances, she is eligible for a discretionary grant of asylum. We conclude also that her proof demonstrates a "clear probability of persecution" which entitles her to mandatory withholding of deportation, sometimes known as "nonrefoulement," required by section 243(h)(1) of the Act. 8 U.S.C. § 1253(h)(West 1970). When Ms. Borja last saw the NPA, they told her she would die if she did not pay. She did not pay. Under these circumstances, on returning to her native land this young woman could only be expected once again to go into hiding to protect her life. The record compels a conclusion that it is "more likely than not" that she would be subject to persecution by the NPA on account of her political beliefs. *See INS v. Stevic,* 467 U.S. 407, 429–30, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). This record is full of evidence that the NPA's promises are not idle. It does not take much of an imagination to understand what will happen to her if the gunmen who drew her

blood discover that she has been returned to her home. This plight is precisely the type of life-threatening predicament that the withholding of deportation is designed to accommodate. As the Supreme Court observed in *INS v. Cardoza–Fonseca*, 480 U.S. 421, 449, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), "Deportation is always a harsh measure; it is all the more replete with danger when the alien makes a claim that he or she will be subject to death or persecution if forced to return to ... her home country."

## VI

Finally, we note that we have taken care not to exceed our authority, and not to second-guess the BIA. Our decisions simply give effect to the will of Congress making eligibility for political asylum and withholding of deportation available to refugees like Ms. Borja who can demonstrate factually a compelling case for such relief. In conferring upon us the responsibility to review these petitions, we believe that Congress expects no less.

We remand this case to the BIA with instructions to present this matter to the Attorney General for the exercise of her discretion under 8 U.S.C. § 1158(b), not inconsistent with this opinion, and for an appropriate order withholding deportation of this petitioner.

PETITION GRANTED.

O'SCANNLAIN, Circuit Judge, with whom KLEINFELD, Circuit Judge, joins, dissenting:

I agree with the majority that the central question in this case is: "Does the evidence Ms. Borja presented *compel* the conclusion that the NPA subjected her to persecution *on account of her political opinion* under the Immigration and Nationality Act[?]" (emphasis added). Notwithstanding its disclaimers, however, the majority's analysis wholly distorts the "compelled" test and, instead, effectively applies "de novo" review of the BIA's decision, contrary to Supreme Court guidance. For this reason, I must respectfully dissent.

Two preliminary observations control. First, an appellate court reviews decisions of the BIA under a highly deferential standard; we may reverse the BIA only if the evidence in the record *compels* a contrary result. *See INS v. Elias–Zacarias*, 502 U.S. 478, 482, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). Second, the Supreme Court's decision in *Elias–Zacarias* makes clear that a petitioner must provide evidence, either direct or circumstantial, of her *persecutors' motives*. As the Court noted:

> [The petitioner] objects that he cannot be expected to provide direct proof of his persecutors' motives. We do not require that. *But since the statute makes motive critical, he must provide some evidence, direct or circumstantial.*

*Id.* at 483, 112 S.Ct. 812 (emphasis added).

This case turns on the NPA's motives in persecuting Borja. Was the NPA motivated by Borja's politics or her money? Under *Elias–Zacarias*, Borja must present evidence that the NPA was motivated to persecute her, at least in part, because of her political opinion. *See id.* at 483–84, 112 S.Ct. 812. The BIA denied asylum to Borja because it concluded that the NPA's "imposition of 'revolutionary taxes' (enforced by threats of harm and enforced by actual harm) was extortion ..., not [related] to the respondent's political opinion, but rather to her ability to pay." In other words, the NPA would have approached her, extorted money from her, and assaulted her regardless of her political opinions.

The BIA based its conclusion that the NPA persecuted Borja to get her money, not on account of political opinion, on several well-founded observations. First, Borja is from a family of means and was thus in a position to supply the NPA with needed resources. Second, the NPA approached Borja only at her parents' place of business; Borja provided no evidence that the NPA sought her at home or at the hospital at which she worked for fifteen

years before leaving the Philippines. Third, Borja failed to demonstrate that she was treated any differently from others who were similarly situated economically. And fourth, as the country profile submitted by the Department of State's Bureau of Democracy reveals:

> A large portion of Philippine asylum applicants allege that the NPA threatens them with death or other harm for refusing to support that organization financially. *In most instances, the NPA is not interested in the political opinion of its intended victim but in the victim's wealth.* ˉ

U.S. Dep't of State, The Philippines: Profile of Asylum Claims and Country Conditions 4 (1995) (emphasis added).

In contrast, the *only* evidence that the majority finds in support of its conclusion that the *NPA* was motivated to persecute Borja because of her political opinion is one threatening gesture against Borja that followed on the heels of Borja's statement of opposition to the NPA.[1] While Borja's statement obviously angered the two NPA members, they left the store as soon as she agreed to pay the requested so-called "revolutionary tax." Furthermore, over the following months, as long as Borja paid the NPA the money it demanded, the NPA did not harm her. When the NPA finally did harm Borja, the evidence is undisputed that it was on account of her refusal to pay the "double tax."[2] There is absolutely no evidence that the NPA cut Borja's arm because of her political hostility toward them. Thus, it appears that the NPA was concerned only with "tax" collection. Certainly, a reasonable fact finder would not be *compelled* to decide otherwise.[3]

I simply am not persuaded that Borja's evidence is so convincing that we are "compelled" to conclude that her persecution was on account of political opinion. *See Elias–Zacarias,* 502 U.S. at 483–84, 112 S.Ct. 812. There is no evidence that the NPA singled Borja out for extortion because of her political opposition to its cause.[4] Indeed, in all likelihood, the NPA knew nothing of Borja's political opinions, but approached Borja because it knew she was wealthy.[5] Moreover, Borja mentioned her political opinion only once, several months prior to the assault; the NPA actually harmed Borja only once, when Borja refused to make payment. Based on this record, the BIA's conclusion that the NPA was not motivated by Borja's

1. The majority claims that this action by the NPA members proves that they were motivated to persecute Borja based on her political opinion. However, it is just as reasonable to infer that this action was motivated by a desire to scare Borja into paying over money.

2. This case is distinguishable from *Vera–Valera v. INS,* 147 F.3d 1036 (9th Cir.1998), because, in that case, the guerillas told the asylum seeker that they wished to "cut off [his] ideas" which they accurately characterized as those of a "capitalist bureaucrat." It is also distinguishable from *Gonzales–Neyra v. INS,* 122 F.3d 1293, 1294 (9th Cir.1997), because in that case, the persecution changed in character after the guerillas learned of the asylum seeker's political opinion, from ordinary criminal extortion, to a threat to destroy his video arcade with him inside it because the games "distracted the youth, made them stupid, and 'diverted their attention from national problems.'"

3. We must keep in mind that we cannot "reverse the BIA 'simply because we disagree with its evaluation of the facts, but only if we conclude that the BIA's evaluation of the facts is not supported by substantial evidence.'" *Aruta v. INS,* 80 F.3d 1389, 1393 (9th Cir. 1996) (quoting *DeValle v. INS,* 901 F.2d 787, 790 (9th Cir.1990) (quoting *Diaz–Escobar v. INS,* 782 F.2d 1488, 1493 (9th Cir.1986))); *see also Mikhailevitch v. INS,* 146 F.3d 384, 388 (6th Cir.1998) ("[W]e may not reverse the Board's determination simply because we would have decided the matter differently.").

4. Borja testified that she was never involved in any political activities.

5. This conclusion is supported by Borja's testimony. She testified that the NPA sought financial assistance from other businesses located in the same area as her parents' business. And she suspected that the NPA sought her out because of her parents' successful business, as well as her family's high standard of living.

political opinion is supported by substantial evidence.[6]

Sweeping aside the substantial evidence that supports the BIA's conclusion, the majority places emphasis on Borja's professed opposition to the NPA. As the Sixth Circuit has recognized, under *Elias–Zacarias*, it is of little concern whether the victim acts on the basis of political opinion: "[T]he motives of the asylum seeker are relevant only to the extent that they illuminate the motives of the alleged persecutors." *Adhiyappa v. INS*, 58 F.3d 261, 267 (6th Cir.1995). While I do not dispute that Borja professed her opposition to the NPA, the issue is whether her statements illuminate the NPA's motives. Given the substantial evidence that supports the BIA's conclusion that those motives were non-political, the illumination her statements provide is negligible.

Moreover, the majority ignores the State Department's finding that "[i]n most instances, the NPA is not interested in the political opinion of its intended victim but in the victim's wealth." This court has held that State Department reports are "'the most appropriate and perhaps the best resource' for 'information on political situations in foreign nations.'" *Kazlauskas v. INS*, 46 F.3d 902, 906 (9th Cir.1995) (quoting *Rojas v. INS*, 937 F.2d 186, 190 n. 1 (5th Cir.1991)). While not dispositive, the report provides additional support for the BIA's conclusion that Borja's persecution was non-political.[7]

While the majority claims that it has "taken care ... not to second-guess the BIA," I regret that is exactly what it has done. The BIA's decision is correct. The NPA, in need of financial support, by threats and force, made one wealthy Filipino after another give money to its cause. Borja, as a wealthy woman, was one of the NPA's targets. When Borja refused to pay, the NPA slashed her arm. Borja's story is disturbing and sad, as the majority eloquently and dramatically describes, but it does *not* establish persecution on account of political opinion. Borja was a victim of extortion and thievery, not political persecution. Borja's evidence that the NPA was motivated by her political opinion is weak at best; it is certainly not "so compelling that no reasonable fact finder could fail to find" in her favor. *Elias–Zacarias*, 502 U.S. at 483–84, 112 S.Ct. 812.

I would deny the petition for review and affirm the decision of the BIA in this case.

---

**6.** Frankly, I am greatly concerned about the consequences of the majority opinion. From now on every victim of extortion in the Philippines (and according to the State Department country profile, there may be many) need only allege that when the NPA approached them for money, they expressed support for the government. Any negative reaction by the NPA necessarily would mean that all subsequent conduct of the NPA was motivated by the petitioner's political opinion. Whether the NPA cared one iota about that opinion would be irrelevant, and whether they were *motivated* by that opinion would be inconsequential, despite the Supreme Court's holding otherwise.

**7.** The majority states that persecution can emanate from sections of the population that the government of that country is either unable or unwilling to control. *See Korablina v. INS*, 158 F.3d 1038, 1044 (9th Cir.1998). While I agree with this statement, Borja presented no evidence that the Philippine government is unable or unwilling to control the NPA. Borja testified that she never reported any of the incidents with the NPA to the Philippine authorities.