**Esther Josephine Bunuan
AGBUYA, Petitioner,**

v.

**IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.**

No. 98–70965.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 16, 1999

Opinion and Dissent Filed July 18, 2000

Opinion Amended March 12, 2001

---

Raquel M. Perez, Encino, California, for the petitioner.

Donald E. Keener, Washington, D.C., Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the respondent.

Before: SCHROEDER, Chief Judge, BETTY B. FLETCHER and CYNTHIA HOLCOMB HALL, Circuit Judges.

Opinion by Judge BETTY B. FLETCHER; Dissenting Opinion by Judge CYNTHIA HOLCOMB HALL.

ORDER AND AMENDED OPINION AND DISSENT

BETTY B. FLETCHER, Circuit Judge:

### ORDER

The opinion filed July 18, 2000 and published at 219 F.3d 962 (9th Cir.2000) is amended as follows:

1. On page 966, just before the subheading, "B. Analysis," insert the following:

We review the BIA's factual findings under the substantial evidence standard. The findings must be supported by reasonable, substantial, and probative evidence on the record considered as a whole. 8 U.S.C. § 1105(a)(4); *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). Reversal should occur where the evidence is such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed. *See Yazitchian v. INS*, 207 F.3d 1164, 1168 (9th Cir.2000).

2. On page 966, in the paragraph beginning "We disagree.", change the sentence beginning "The evidence shows that the communist NPA" to read: A reasonable factfinder would have to conclude that the communist NPA interpreted Agbuya's actions as an affront to their cause:

3. On page 967, at the end of the paragraph beginning "The dissent argues," replace the sentence that reads, "As such, she is entitled to political refugee status." with the following sentences: The BIA erred because its determination was not supported by reasonable, substantial, and

probative evidence on the record considered as a whole. Agbuya is entitled to political refugee status.

With these amendments made, a majority of the panel has voted to deny the petition for rehearing and petition for rehearing en banc. Judge Hall voted to grant the petition for rehearing and petition for rehearing en banc.

The full court received the petition for rehearing en banc. An active judge called for an en banc vote, and a majority of the active judges of the court, advised of the within amendments, has voted to deny the petition for rehearing en banc. Fed. R.App. P. 35(b).

The petition for rehearing and petition for rehearing en banc are DENIED.

## OPINION

Esther Josephine Bunuan Agbuya, a citizen of the Philippines, petitions for review of the Board of Immigration Appeals' (BIA) dismissal of her appeal from an Immigration Judge's (IJ) denial of her application for asylum and withholding of deportation pursuant to 8 U.S.C. §§ 1158(a) and 1253(h). Agbuya argues that she has a well-founded fear that the New People's Army (NPA) will persecute her if she returns to the Philippines, and that such persecution will be "on account of" her political opposition to the NPA's communist cause. We have jurisdiction to entertain a petition for review of the BIA's decision pursuant to section 106(a) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1105a(a).[1] We grant the petition for review, find petitioner eligible for asylum and grant her application for withholding of deportation.

I.

Esther Agbuya lived in northern Luzon, the Philippines, and had worked since 1980 for the Benguet Mining Company in the personnel department. She was responsible for terminating employees or notifying individuals that they were being disciplined for various infractions and employment-related difficulties. From 1985–1991, the company implemented a series of retrenchments. During this period, Agbuya had serious problems with the union of miners, who disagreed with the retrenchment policy and the order in which workers were being dismissed. On one occasion, the miners rallied against her, displaying signs that called for her firing. Agbuya learned that the union had been infiltrated by members of the New People's Army ("NPA"), an armed communist guerilla group responsible for numerous deaths and kidnappings. She began to receive telephone calls demanding her resignation and threatening her family if she failed to comply. Afraid of retaliation by the NPA, she resigned on July 12, 1991.

On September 1, 1991, almost two months after her resignation, Agbuya was waiting for her husband to pick her up in Baguio City, fourteen kilometers from the mine, when she was abducted by three heavy-set men whom she did not know. They forced her into a car and drove her to a house over an hour away. They held her captive for one week, keeping her blindfolded the entire time and subjecting her to physical abuse. On one occasion, they placed a gun in her mouth. During the course of her captivity, Agbuya's kidnappers identified themselves as NPA members sympathetic to the plight of the Benguet miners. The NPA kidnappers

1. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) was enacted on September 30, 1996. *See* Pub.L. No. 104–208 (Division C), 110 Stat. 3009–546. IIRIRA repealed section 106(a) of the INA, and replaced it with a new judicial review provision at section 242 of the INA. This repeal became effective on April 1, 1997. *See* IIRIRA § 309(a). However, for cases where, as here, deportation proceedings began before April 1, 1997, and where the final order of deportation was issued after October 30, 1996, IIRIRA's "transitional rules" provide that, with certain exceptions not relevant to this case, the court of appeals has jurisdiction under old section 106(a) of the INA. *See* IIRIRA §§ 309(c)(1) and (4), 110 Stat. 3009–625–26.

told her they would try her in a kangaroo court for her abuse and mistreatment of the workers. Agbuya was extremely frightened to say anything about her view of the labor situation, so she simply told the men that they should sit down and present their ideas to the government. Agbuya was afraid for her own life, and for the welfare of her youngest child who was still nursing at the time.

The guerillas demanded a ransom of 150,000 pesos from her family. She was released on September 8 after her family paid the full ransom. But the guerillas warned Agbuya that wherever she worked, they would keep her under surveillance. Following the abductors' instructions and afraid of further reprisal, Agbuya and her family never reported the kidnapping to the police or to the mining company. Agbuya was too frightened to return home for several months. On April 25, 1992, she came to the United States and later applied for asylum. During her absence, her family has received several phone calls checking on her whereabouts.

## II.

On October 17, 1995, an Immigration Judge denied Agbuya's application for asylum and withholding of deportation, but granted voluntary departure. Although the IJ had "no difficulty with her credibility," she concluded that Agbuya had not established a well-founded fear of persecution. The BIA affirmed, concluding that any persecution Agbuya had previously suffered was not on account of her political opinion. The BIA found that "[t]he direct and circumstantial evidence does not support an inference that the miners' threats and actions against her were motivated by anything other than their anger at adverse personnel actions ... which they considered to be unfair or in violation of their contract." Agbuya timely petitioned this court for review of the BIA's decision.

### A. *General Standards for Asylum Eligibility*

To be eligible for asylum, Agbuya must show that she is "unwilling or unable" to return to her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (defining "refugee"). To establish a well-founded fear of persecution, Agbuya must show her fear to be both objectively reasonable and subjectively genuine. *See Fisher,* 79 F.3d at 960. The objective component of this test requires showing "by credible, direct, and specific evidence in the record, that persecution is a reasonable possibility." *Meza–Manay v. INS,* 139 F.3d 759, 763 (9th Cir.1998) (quoting *Singh v. Ilchert,* 63 F.3d 1501, 1506 (9th Cir.1995)). This showing may be made "by the production of specific documentary evidence or by the credible and persuasive testimony of the applicant." *Id.* "[P]ersecutory conduct may have more than one motive, and so long as one motive is one of the statutory grounds, the requirements have been satisfied." *Singh v. Ilchert,* 63 F.3d at 1509; *see Briones v. INS,* 175 F.3d 727, 729 (9th Cir.1999); *Borja v. INS,* 175 F.3d 732, 735 (9th Cir. 1999); *Ratnam,* 154 F.3d at 994; *Rodriguez–Roman v. INS,* 98 F.3d 416, 430 n. 23 (9th Cir.1996).

Evidence of past persecution alone can establish a well-founded fear. *See id.* Establishing past persecution triggers a rebuttable presumption of a well-founded fear of future persecution. *See* 8 C.F.R. § 208.13(b)(1)(i). The INS can rebut this presumption by showing by a preponderance of the evidence that conditions "have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return." *Id.*

Where an asylum applicant relies on past persecution on account of political opinion to establish a rebuttable presumption of a well-founded fear of future persecution, she must show that (1) she was a victim of persecution, (2) she holds a political opinion or has had one imputed to her, (3) her political opinion was known to or

imputed by her persecutors, and (4) the persecution was on account of her actual or imputed political opinion. *Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir.1997). When an applicant has been persecuted because of an opinion imputed to her, our analysis focuses on how the persecutor perceived the applicant's actions and allegiances, and what motivated their abuse. In *Sangha,* we held that:

> In establishing an imputed political opinion, the focus of inquiry turns away from the views of the victim to the views of the persecutor. We consider, however, not the persecutor's own political opinions, but rather the political views the persecutor rightly or in error attributes to his victims. If the persecutor attributed a political opinion to the victim, and acted upon the attribution, this imputed view becomes the applicant's political opinion as required under the Act.

*Id.* at 1489 (internal citation omitted). In *Desir v. Ilchert,* 840 F.2d 723 (9th Cir. 1988), we examined the case of a Haitian man who was arrested, threatened, and assaulted by the Ton Ton Macoutes because he refused to pay bribes. We examined Desir's refusal in the context of the Haitian political system as a whole and concluded that "Desir's refusal to accede to extortion in a political system founded on extortion resulted in his classification and treatment as a subversive." *Id.* at 727.

■ We review the BIA's factual findings under the substantial evidence standard. The findings must be supported by reasonable, substantial, and probative evidence on the record considered as a whole. 8 U.S.C. § 1105(a)(4); *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). Reversal should occur where the evidence is such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed. *See Yazitchian v. INS,* 207 F.3d 1164, 1168 (9th Cir.2000).

### B. *Analysis*

■ In this case, the IJ found Agbuya's testimony to be credible and worthy of full weight as evidence, and the BIA did not find otherwise. Accordingly, we accept Agbuya's testimony as true. *See Singh v. INS,* 94 F.3d 1353, 1356 (9th Cir.1996). The point of contention is over the reason for the NPA's persecution of Agbuya. In the BIA's view, Agbuya failed to show that the kidnapping was motivated by any political opinion-imputed or actual-or by "any position of political neutrality which she may have had."

■ We disagree. There is little doubt that Agbuya was singled out by the guerillas for persecution because of the unpopular actions she took while an employee of Benguet. In the context of the communist guerilla insurgency in the Philippines, however, Agbuya's personnel actions took on an importance beyond their impact on the miners. A reasonable factfinder would have to conclude that the communist NPA interpreted Agbuya's actions as an affront to their cause: Agbuya was viewed as politically aligned with the mining company and the government, and against the NPA. Indeed, the fact that Agbuya was kidnapped and threatened only *after* she had resigned her position and that the NPA threatened to monitor her activities in the future indicates that she was identified by the NPA as an enemy for more than simply the job she held. Further, Agbuya's NPA captors explained that they objected not only to the specific employment-related actions she took at the mine, but also to her "wrongdoings to the laborers of the Philippines," a statement demonstrating the content of the opinion imputed to Agbuya. Once she was perceived as an enemy of a particular group of workers—those at the Benguet Corporation—the NPA targeted her as an enemy of the "laborers" of the whole country and thus as an opponent of the guerilla group. This link was made explicitly by Agbuya's NPA persecutors, who berated her for opposing their egalitarian ideology by acting unfairly toward the miners, with whom they sympathized.

We have found an imputed political opinion in situations where it is "likely that the persecutors will attribute the political views of others to the applicants." *Sangha*, 103 F.3d at 1489; *see also Briones*, 175 F.3d at 729 (finding petitioner had a hostile political opinion imputed to him by his NPA persecutors). The NPA kidnapped and threatened Agbuya because she was perceived to be pro-government and therefore an enemy of the miners and the NPA. Just as the refusal to pay the Ton Ton Macoutes gave rise to an imputed political opinion in *Desir*, here Agbuya's identification with Benguet management as a result of her job led to her classification and treatment as an opponent of the communist NPA. *See Desir v. Ilchert*, 840 F.2d 723 (9th Cir.1988).

■■■ The dissent argues that Agbuya's persecution amounted to "economically-motivated persecution." Dissent at 3052. The dissent stresses that Agbuya did not make any political statements or consciously side with anyone in the struggle. As discussed above, such purported silence and neutrality does not decide the matter. Instead, we must look at how she was

viewed in the eyes of the persecutors. Here, the guerilla NPA viewed Agbuya as an enemy of the miners, the NPA, and the communist cause. Agbuya need not identify herself in this way to qualify for political asylum.[2] She was abducted, falsely imprisoned for a week, hit, threatened with a gun, and told she would be tried in a kangaroo court because of a political opinion imputed to her by her persecutors. All of this happened after she left her job, indicating that the NPA was after Agbuya for what they perceived to be her political views. She was not, as the dissent indicates, persecuted because she was rich or middle class. Instead, she was persecuted, like so many refugees who seek safe haven in the United States, because she was identified as an opponent of communism. The BIA erred because its determination was not supported by reasonable, substantial, and probative evidence on the record considered as a whole. Agbuya is entitled to political refugee status.[3]

Our finding that Agbuya has established past persecution entitles her to a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R.

---

**2.** The dissent finds *Desir* inapposite, stating that "it is utterly implausible that labor-management relations is as central to the underpinnings of the Philippines' political system as extortion was to the Haitian political system under Duvalier." Dissent at 3059. However, the State Department Report on Human Rights Practices for 1994 makes clear that the government of the Philippines is engaged in an ongoing violent struggle with the communist NPA, and the record demonstrates that central to the guerillas' advocacy of communism is the belief in more egalitarian labor-management relations. In fact, in 1990 the NPA raided Benguet Mining Corp., stealing millions in cash and gold and silver bars, and taking two of the company's executives hostage. A newspaper article on the incident suggested that the NPA was using the hostages and valuables to negotiate the settlement of a long-standing labor dispute. The NPA's active involvement in the labor dispute illustrates that it regarded the miners' plight as one of its causes. It follows that Agbuya's perceived opposition to this cause was regarded as opposition to the NPA itself.

**3.** The dissent's reading of our decision as "essentially conflat[ing] an economic motivation with a political one," dissent at 3060, misapprehends our opinion. We believe that the record clearly establishes that while Agbuya's initial threats by Benguet miners were economically motivated, the NPA's later involvement on behalf of its laborers and in furtherance of its own egalitarian labor-management agenda establishes the political nature of her later persecution.

We also disagree with the dissent's claim that our finding of past persecution conflicts with the Seventh Circuit's decision in *Cuevas v. INS*, 43 F.3d 1167 (7th Cir.1995). In *Cuevas*, the asylum applicants testified that land squatters associated with the NPA persecuted them because they refused to sell them land so that they could grow rice. *See id.* at 1171. There was no indication that the feud between the NPA squatters and the applicants was based on anything other than both parties' desire to take advantage of the land's economic value. *See id.* Here, in contrast, Agbuya was persecuted because she was viewed as an enemy of laborers and the communist cause.

§ 208.13(b)(1)(i). This presumption may be overcome by evidence "that since the time the persecution occurred conditions in [the Philippines] have changed to such an extent that [Agbuya] no longer has a well-founded fear of being persecuted if she were to return." *Id.*; *see also Matter of Chen*, 20 I. & N. Dec. 16 (BIA 1989).

 The INS in this case failed to rebut the presumption by showing the effect of changed country conditions. The BIA itself noted that according to the State Department's report on country conditions in the Philippines in 1994, kidnappings by the NPA continue to be a problem in the Philippines. The report also states that the government has not been successful at curbing continued human rights abuses committed by the NPA. The INS presented no evidence to overcome the presumption that Agbuya has a well-founded fear of persecution if she were to return to the Philippines.

Because the INS did not rebut the presumption that Agbuya had a well-founded fear of persecution on account of political opinion, the BIA erred by denying that Agbuya was eligible for asylum. *See* 8 C.F.R. § 208.13(b); *Singh v. Ilchert*, 63 F.3d 1501, 1510 (9th Cir.1995). In addition, because the INS did not rebut the presumption that it is more likely than not that Agbuya's life or freedom would be threatened upon returning to the Philippines, the BIA erred by denying her application for withholding of deportation. *See* 8 C.F.R. § 208.16(b)(2); *Singh*, 63 F.3d at 1510.

We remand this case to the BIA with instructions to grant petitioner's application for withholding of deportation and to present this matter to the Attorney General as eligible for the exercise of her discretion as to asylum under 8 U.S.C. § 1158(b).

PETITION GRANTED.

CYNTHIA HOLCOMB HALL, Circuit Judge, dissenting.

The majority opinion in this case stretches the meaning of political persecution to cover those aliens who are persecuted on purely economic grounds. Because I believe that only Congress has the authority to re-write our immigration laws in this manner, I dissent.

I.

The majority opinion's recitation of the facts glosses over in a few sentences a sequence of events that the BIA thought pivotal in explaining why Petitioner was abducted. Petitioner began working for the Benguet Mining Company as a personnel clerk in 1980. Petitioner was rapidly promoted within the Company's personnel department. Petitioner was responsible for the unenviable tasks of terminating workers and notifying workers when they were being disciplined for habitual absences, theft of company property, or inefficient work practices.

In 1985, when the Company began a series of downsizing programs that sparked much hostility among the Company's unionized miners, Petitioner became a lightning rod for union members' fierce criticism of company policies. At one heated meeting, Petitioner was assaulted by the local union president. After a second round of downsizing in 1989, the union members petitioned management, seeking Petitioner's discharge. The union also staged a rally at the company's main gate demanding that she be removed from office. The Company again downsized its workforce in 1990 and 1991, making Petitioner the target of even more scorn from angry laborers. At work, Petitioner received telephone calls threatening her and her family if she did not resign. Petitioner was also subjected to other harassment from workers: At one point a disgruntled worker swung a chair at her, and union members even called her a terrorist. In addition, her children had to be escorted to their school buses because of concerns about their safety. Fed up with this union harassment, and also harboring· concerns about the propriety of some of her supervisor's actions, Petitioner resigned in July of

1991. Approximately two months after her resignation, three individuals identifying themselves as NPA members abducted Petitioner.

The important question in this case is not whether what happened to Petitioner was persecution. Rather, the panel here must focus on why Petitioner was abducted and abused. Petitioner described her captors' motivations at great length in her hearing before the Immigration Judge:

> They wanted me to accept the faults that I'd been doing during my work or during my tenure in that Benguet gold operation to accept that I'd been doing, that I have had wrongdoings to the laborers of the Philippines.... Yeah, they told me that they belonged to the NPA group and they sympathized with the workers of Benguet Corporation because they claimed that we had been so abusive and we'd been threatening them to be discharged.

Administrative Record at 57. On cross-examination, INS Counsel asked further questions to probe Petitioner's views regarding why she was abducted:

Q. During the time that you were being held by these individuals, what did they tell you? Did they say anything to you or ask you any questions?

. . . . .

A. They told me that I had been abusive, that I had been coercing the employees of Benguet Corporation and I'd been doing unlawful termination to the employees.

Q. So, they were primarily interested in your alleged injustices that you committed to the workers while you were employed?

A. Uh-huh.

Q. Is that yes?

A. Yes sir.

Q. So, their main problem with you was the fact that they didn't think that you were being fair when you were employed with Benguet Corporation?

A. Yes sir.

. . . . .

Q. [D]id the rebels express any other problems with you other than those that stemmed from your employment?

A. Yeah, they told me that it's my personality in dealing with the workers.

Q. You were too harsh on them.

A. They think I was too strict on them.

Q. Was anything else discussed?

A. Nothing more, sir.

Administrative Record 67–69. This was followed by further questioning on re-direct. Trying to elicit testimony to establish political persecution, Petitioner's counsel initiated the following exchange about her captors:

Q. Did you ever state your position as to the NPA or to the Philippine government?

A. What position are you referring to as, sir?

Q. Your political opinion. In other words, did you ever discuss what side you were on?

A. No, I didn't side anybody.

Administrative Record at 71. Petitioner then stated that she was afraid to make any political statements because she believed that doing so would antagonize her captors.

In short, this record clearly establishes that Petitioner was singled out by the NPA because of her unpopular actions in a bitter conflict between Company management and labor. Petitioner's abduction was the culmination of a lengthy campaign by union members to harass and intimidate Petitioner and to force her discharge. Petitioner was plainly identified as the human face of a mining company's downsizing program, and was subjected to inhumane harassment as a result. Like the majority, I find the harassment Petitioner had to endure quite disturbing. But my personal feelings aside, I can find nothing in this record that comes close to indicating that Petitioner was ever persecuted on account of imputed political opinion.

## II.

After an unusually thorough review of the evidence that prompted the Immigration Judge to deny Petitioner's asylum application, the Board of Immigration Appeals dismissed her appeal on the grounds that she had failed to prove that she had been persecuted on account of her political opinion. In reviewing that finding, we must defer to the BIA's expertise. "To reverse the BIA finding we must find that the evidence not only supports [a contrary] conclusion, but compels it." *INS v. Elias–Zacarias,* 502 U.S. 478, 481 n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). Moreover, the applicant has the burden of establishing a "causal connection" between the persecution and the political opinion. *Sangha v. INS,* 103 F.3d 1482, 1486–87 (9th Cir. 1997).

In Petitioner's case, there is simply no evidence that politics ever entered into the NPA's persecution calculus. This is a straightforward case of persecution on exclusively economic grounds. As her own testimony reveals, when NPA guerrillas asked Petitioner whose side she was on in the political disputes gripping the Philippines, Petitioner responded "I didn't side [with] anybody." Petitioner unambiguously and repeatedly testified that she was abducted and abused because her captors viewed her actions, all of which were made within the scope of her employment with the Company, as unduly harsh.

In viewing Petitioner's persecution as political in nature, the majority places great emphasis on the facts that Petitioner "was kidnapped and threatened only *after* she had resigned her position and that the NPA threatened to monitor her activities in the future." From this fact the majority concludes that "she was identified by the NPA as an enemy for more than simply the job she held." This conclusion simply does not follow. The NPA may have continued to persecute Petitioner even after her resignation for any number of reasons stemming from sheer vindictiveness to a desire to make an example of her in order to deter other company employees from disciplining union members in the future. Or they may have felt that by kidnapping her after her resignation, they would encounter less "heat" from the Company and the authorities. Perhaps the NPA found itself in desperate need of cash on the day of the abduction, and targeted Petitioner as someone whose relatives were likely to come up with 150,000 pesos in ransom. For all we know, her captors may have mistakenly believed that Petitioner was still working for the Company on the day they abducted her—she had resigned less than two months previously. Unlike the majority, I'd prefer not to decide this case on the basis of speculation not articulated in the record. The BIA examined the record and drew a reasonable conclusion:

> [H]er disputes with the miners stemmed from the respondent's performance of her job duties by implementing company personnel policies in a way which the union, rightly or wrongly, perceived as unjust. The direct and circumstantial evidence does not support an inference that the miners' threats and actions against her were motivated by anything other than their anger at adverse personnel actions, including disciplinary actions and layoffs which they considered to be unfair or in violation of their contract.

I am profoundly troubled that the majority effectively ignores the substantial evidence standard by disregarding this BIA conclusion on the basis of far-fetched speculation about the chronology of events.

The majority's second justification for reversing the BIA's determination stems from a single out-of-context quote about Petitioner's "wrongdoings to the laborers of the Phillippines." The majority concludes that this quote demonstrates that the kidnappers imputed to Petitioner some vague ideological opposition to the rights of workers everywhere in the country. The majority then leaps to the conclusion that this opposition obviously rendered Petitioner "an opponent of the guerilla group" in the minds of her captors. The extensive transcript quotations I repro-

duce above demonstrate that such a reading of Petitioner's testimony is implausible. Her captors quite obviously objected to the employment actions Petitioner had taken at a single mine. When her captors asked Petitioner about her views toward the NPA, she told them that she did not side with anybody. There is no evidence in the record that the NPA kidnappers viewed Petitioner as an ideological person. The majority's conclusion that the BIA lacked substantial evidence to support its conclusion is puzzling, given the pages of Petitioner's testimony where she unambiguously stated that she was singled out because of unpopular employment actions and perceived harshness in dealing with union members.

Even under this court's most expansive interpretations of the "on account of political opinion" language, Petitioner cannot prevail. *Briones v. INS*, 175 F.3d 727, 728 (9th Cir.1999) (en banc), involved an alien who had worked as a confidential informer for the government of the Philippines, supplying it with information that the government used to apprehend and eliminate NPA operatives and defeat NPA guerrillas in combat. This court held that Briones's "active involvement in a fiercely ideological dispute between the government of the Philippines and the Communist NPA" raised a likelihood that the NPA imputed certain political views to Briones. Briones was employed by the government in a civil war against the NPA. By contrast, Petitioner was employed by a private firm involved in a labor dispute with its employees. It is therefore not difficult to characterize Briones's activity as political and Petitioner's as nonpolitical.

Similarly, in *Vera–Valera v. INS*, 147 F.3d 1036 (9th Cir.1998), this court held that Vera–Valera's prominent, publicly-articulated support for a Peruvian government project designed to weaken the

Sendero Luminoso, and his subsequent persecution at the hands of Sendero Luminoso members who "accused him of being a spy for the government," amounted to persecution on account of his political opinions. *Id.* at 1038–39. Petitioner never mentioned supporting the government of the Philippines, nor did the NPA ever accuse her of being a government supporter.

In *Borja v. INS*, 175 F.3d 732, 734 (9th Cir.1999) (en banc), this court determined that an alien who was persecuted after she told armed NPA operatives that she would not join their organization because she was "pro-government," had indeed been persecuted "on account of her political opinions." The court went to great lengths to note Borja's "outspoken political opinion," and her drawing of "a political line in the sand." *Id.* at 736. This outspokenness is in sharp contrast to Petitioner's silence.

Finally, the majority cites *Desir v. Ilchert*, 840 F.2d 723 (9th Cir.1988). In *Desir*, this court held that the petitioner's refusal to pay extortion money to the Haitian Ton Ton Macoutes was an expression of political opposition only because the Haitian political system was founded on extortion. *See id.* at 727 ("To challenge the extortion is to challenge the underpinnings of the political system."). Outside of a political environment as unique as the Haitian "kleptocracy" that prevailed under Duvalier, refusing to pay extortion money is not an expression of political opposition. *Cf. Elias–Zacarias*, 502 U.S. at 481, 112 S.Ct. 812 (holding that refusing to join a guerrilla group is not political expression). Moreover, it is utterly implausible that labor-management relations is as central to the underpinnings of the Philippines' political system as extortion was to the Haitian political system under Duvalier. Certainly nothing in the record suggests as much.[4] In any event, even if *Desir* is

---

4. Footnote 2 of the majority opinion states that "the record demonstrates that central to the guerillas' advocacy of communism is the belief in more egalitarian labor-management relations." I remain unsure what, precisely, in the record demonstrates that trend. To the

contrary, my reading of the record suggests that the NPA seeks only power itself. For example, page 99 of the Administrative Record, which is a copy of a 1991 Amnesty International Report, documents numerous in-

read most expansively, it does not support the proposition that Petitioner's employment actions resulted in an imputation of anti-NPA political opinions to her: That question is factual, not legal; and the analogy between refusing to pay a bribe and holding down a job is something of a stretch.

In holding that an alien who is persecuted based purely on economic actions taken in the private sector is eligible for asylum, the majority creates a split among the circuits. The majority's holding is inconsistent with the Seventh Circuit's opinion in *Cuevas v. INS*, 43 F.3d 1167 (7th Cir. 1995). In *Cuevas*, the petitioners were absentee landlords who were harassed and threatened after they refused to sell their agricultural land to squatters who were acting on behalf of the NPA. The Court noted that regardless of the squatters' political orientation, the fact remained that they were interested in purchasing the land simply "in order to grow rice." *Id.* at 1171. The Seventh Circuit wisely determined that whatever harassment petitioners endured as a result of their failure to sell the land was economic intimidation, and not political persecution. The court therefore held that the petitioners had failed to demonstrate persecution on the basis of a protected ground. I would follow *Cuevas* and deny the petition in the case at bar.

By holding that Petitioner was persecuted on the basis of her political beliefs, the majority essentially conflates an economic motivation with a political one. But in writing the Immigration and Nationality Act, Congress did not intend to provide those persecuted on economic grounds with refugee status. Given that decision by Congress, the courts must not do what the majority has done here: collapse economic and political persecution into the same category. All over the world, individuals are persecuted because they are rich or poor. Workers are oppressed by

management in nations across the globe and, as we see in this case, workers sometimes persecute managers as well. Congress might one day decide to protect all these victims of economic persecution with refugee status. But that is a decision for Congress to make; and the courts must not usurp that congressional prerogative. I respectfully dissent.

---

stances in which the NPA has assassinated mainstream labor union activists because of their refusal to acquiesce in the NPA's violent, revolutionary tactics. When it comes to la-bor-management disputes, the NPA's egalitarianism appears limited to ensuring that both workers and managers live in a state of fear.