# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2818

_____

Thays Xinia Guerrero De Brenner;    *
Roberto Leonardo Brenner-Galarza;   *
Romina Mariana Brenner-Guerrero,    *
                                    *
    Petitioners,               *   Petition for Review of an
                                    *   Order of the Board of
    v.                         *   Immigration Appeals.
                                    *
John Aschcroft, Attorney General of *
the United States of America,       *
                                    *
    Respondent.                *

_____

Submitted: June 14, 2004
Filed: November 10, 2004

_____

Before LOKEN, Chief Judge, HEANEY and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Petitioners appeal the Board of Immigration Appeals's ("BIA") reversal of an immigration judge's decision to grant asylum. The immigration judge found that the petitioners were credible and subject to past persecution in their home country of Peru. The immigration judge further found that evidence of changed country conditions did not overcome the presumption of a well-founded fear of future

persecution. The BIA, however, concluded that the immigration judge failed to determine if the past persecution occurred due to a protected statutory basis. The BIA proceeded to determine that any past persecution occurred due to the petitioners' wealth rather than a protected statutory basis such as political opinion. The BIA also made an alternative finding that, even if persecution occurred due to a statutory basis, changed country conditions removed any objectively reasonable fear of future persecution.

Regarding the issue of past persecution, we reverse. The administrative record compels the conclusion that the petitioners suffered persecution due at least in part to a statutory basis, namely, imputed political opinion. Further, in reaching its alternative finding on the issue of changed country conditions, the BIA failed to place the burden of proof on the Immigration and Naturalization Service ("INS") (now the Department of Homeland Security, "DHS") to show that changed country conditions overcame the presumption of a well-founded fear of future persecution. Accordingly, we remand to the BIA for reconsideration on the issue of changed country conditions.

I.

The immigration judge specifically found the petitioners credible. He based his decision to grant asylum, in part, on his credibility determination. Although the BIA reversed the immigration judge's ultimate conclusions, it did not reject his credibility findings. Accordingly, we review the record and set forth our detailed recitation of the facts in a light that reflects these credibility findings.

Lead petitioner Thays Xinia Guerrero De Brenner ("Ms. De Brenner") was born in 1966 and comes from a Peruvian family of eight that was wealthy by local standards. Her mother was a professor of nursing, and her family owned a cocoa plantation and local shoe store in the city of Ayacucho. They also owned a hotel in the nearby coastal city of Ica.

In 1982, guerrillas with a Marxist, revolutionary, terrorist group known as Sendero Luminoso ("Shining Path") targeted her family. The Shining Path originated near Ayacucho around 1980. Ms. De Brenner described the Shining Path as a group whose goal was to take from the rich and give to the poor. From 1982 until as late as 1997, Ms. De Brenner's family received direct threats, some of which were extortionate demands, from Shining Path guerrillas. Some of the threats were notes signed by Abimael Guzman, leader of the Shining Path. Strangers followed and monitored the family, and the threats described the family's activities and movements with great detail. In the demands, the guerrillas sought financial and material assistance (food, medicine, shoes). For a time, the family complied. When the family refused to comply, the guerillas threatened to "disappear" the family's children. Ms. De Brenner's mother resigned from her position as a nursing professor because of the threats. In some of the threats the Shining Path guerillas mentioned Ms. De Brenner, the oldest daughter of the family, by name. In other threats, they claimed the family was associated with the then-ruling party in Peru.

Also in 1982, the guerrillas published Ms. De Brenner's parents' names along with the names of approximately thirty other business or property owners on a "blacklist" posted throughout Ayacucho. According to Ms. De Brenner, the blacklist stated "death to the traitors" and "death to those who don't cooperate." In addition, the blacklist stated that the Shining Path deemed the persons on the list to be "not advancing the lives of the masses or merely as being uncooperative."

Even before the guerillas published the blacklist, they had murdered numerous people in Ayacucho. After Ms. De Brenner's family saw the list, they were afraid to leave their home. They frequently sought, and sometimes received, police protection. Police protection was often unavailable, however, because the police were occupied fighting the Shining Path guerrillas. Eventually, Shining Path guerrillas infiltrated the ranks of the army and the police and confusion reigned. The guerrillas murdered some of the people named on the blacklist. In 1989, the guerrillas published another

blacklist that contained Ms. De Brenner's parents' names. Ms. De Brenner's name was not on either the 1982 or 1989 blacklists.

Although the guerrillas did not physically harm Ms. De Brenner or her immediate family, they burned her family's cocoa plantation and turned it into a cocaine plantation, destroyed a lumber business that her family had tried to develop, tortured and killed her mother's cousins, and tortured, raped and killed a number of family friends and acquaintances in and around Ayacucho. In the affidavit that accompanied her application for asylum, Ms. De Brenner reported the details surrounding much of the Shining Path's savagery towards her family and friends in Ayacucho. She described the torture, castration, and murder by skinning of prominent Ayacucho citizens in front of their families as well as crucifixions and less dramatic assassinations.

In 1983, Ms. De Brenner left the family home in Ayacucho because of the threats and violence and moved to Arequipa, Peru, to live with other relatives for five months. When the situation temporarily settled down in Ayacucho, she returned home. After three months, however, because of escalating violence, she moved to Lima to live with family friends. Eventually, all members of the family moved away from Ayacucho. The threats continued, however, as the Shining Path movement expanded from Ayacucho to encompass more of Peru.

While in Lima, Ms. De Brenner maintained a low profile and met few people. She did, however, meet and marry Roberto Leonardo Brenner-Galarza ("Mr. Brenner"), a close friend of the family that hosted her in Lima. Ms. De Brenner and Mr. Brenner had their first child, Romina Mariana Brenner-Guerrero ("Romina").[1]

---

[1]Mr. Brenner and Romina are the other petitioners in this case. Under the Immigration and Nationality Act, "[a] spouse or child . . . of an alien who is granted asylum . . . may, if not otherwise eligible for asylum . . . be granted the same status as the alien if accompanying, or following to join, such alien." 8 U.S.C. § 1158

Mr. Brenner does not claim that he received any threats from Shining Path guerrillas before he married Ms. De Brenner. He did lose a job when a hotel/casino that he worked for suffered a loss of business due to Shining Path threats and bomb scares. He later worked as a sales representative for Pepsico, Co. For Pepsico, Co., he had to travel with police protection to areas of Peru that the government labeled "red zones" based on high levels of Shining Path activity. He stated that Shining Path guerrillas targeted employees of Pepsico, Co. because it was a corporation with ties outside Peru, and the Shining Path was opposed to corporations with ties outside Peru.

While still in Lima, Ms. De Brenner began work as a secretary in a state-owned bank. She eventually became the executive secretary to the General Manager. The General Manager was an active, senior member of the APRA, the party in power. The APRA opposed the Shining Path. Shining Path guerrillas targeted bank employees and members of the APRA in particular.

Ms. De Brenner claimed that "the frequency and tenor of the threats escalated because of my career with the state-owned bank, Banco Minero de Peru, and my husband's career with Pepsico Co., an American-owned ("Imperialist") corporation." She claimed that, after she began her work at the bank and Mr. Brenner began his work at Pepsico, Co., the Shining Path guerillas more frequently directed their threats towards her and her husband rather than her parents. She stated in her affidavit:

> Sendero Luminoso's threats stated that they knew where I was working, what position I held. They stated that I was working for the APRA

---

(b)(3)(A). For the purposes of that section, a child is, inter alia, a person under twenty-one years old. 8 U.S.C. § 1101(b)(1). Classification as a child continues if the person remains unmarried, was a child when his or her parent filed for asylum, and reached the age of twenty-one while the application was pending. 8 U.S.C. § 1158(b)(3)(B). Romina is still younger than twenty-one.

(Aprista), the party in power. They spoke badly about the government and wrote that Roberto and I were guilty of the same "misdeeds" as the government . . . "exploiting the poor and promoting a capitalist, imperialistic society."

. . .

Sendero Luminoso also insisted that I was actually working for the party as the personal secretary to [the APRA member and Banco Minero de Peru General Manger] Mr. Rivas. They went so far as to charge that I was appointed to my job because of my social standing. I was his secretary but of the bank, not his personal secretary and not a secretary for the party.

In 1994, Ms. De Brenner, Mr. Brenner, and Romina left Peru and came to the United States under visas that listed them as nonimmigrant visitors for pleasure. Their visas authorized a one-year stay in the United States. They joined Mr. Brenner's cousin, who lived in Minneapolis. After Ms. De Brenner, Mr. Brenner, and Romina arrived in the United States, they remained until the present time with no departures. Ms. De Brenner and Mr. Brenner had a second child in 1997, Daniel, who was born in the United States.

The INS instituted removal proceedings against the petitioners—Ms. De Brenner, Mr. Brenner and Romina—on December 14, 1998. The petitioners conceded removability, but applied for asylum, withholding of removal, and relief under the Convention Against Torture. An immigration judge received extensive documentation regarding the country conditions in Peru and affidavits from the adult petitioners. In addition, the immigration judge held an evidentiary hearing on April 12, 2000. Ms. De Brenner provided extensive and detailed testimony, Mr. Brenner testified, and the attorney for the INS chose not to cross-examine either witness.

Ms. De Brenner explained that some members of her family still live in Peru, and have received no threats since approximately 1997. In the last threat, Shining Path guerrillas sought aid, but her family ignored the request with no adverse

consequences. Other members of her family left Peru and sought asylum in other countries.

As noted above, the immigration judge found Ms. De Brenner and Mr. Brenner credible. He stated:

> The Court has no real reason to dispute the credibility of the respondents. Their testimony throughout their dealings with the Immigration Service and this Court has been consistent. The bulk of the testimony comes from the female respondent, detailing her own family's history of problems starting in Ayacucho in the early 1980s and continuing up to the time that the family left Peru in 1994. The Court finds this testimony credible, based on the observation of the witnesses, and also based on the consistency of the respondents' stories with the well-documented conditions in Peru. The Court will accordingly find the witnesses credible. . . .

> Her testimony is clear that her family was wealthy by Peruvian standards. As a result of the family being well-to-do and owning several businesses, they were targeted for threats of violence by the Shining Path. The Court feels that the evidence is overwhelming that the Shining Path is one of the most violent terrorist organizations in the world in the last 25 years. The fact that the respondent's family was targeted because of their wealth and business activities is not surprising in light of the documented activities of Shining Path. Shining Path was a Marxist revolutionary organization seeking to overthrow the government and economy of Peru to replace it with a revolutionary peasant states [sic]. It is very credible that the respondent and her family would have received the threats she describes.

The immigration judge went on to find that the family experienced past persecution and therefore, held a well-founded fear of future persecution. He also found that country conditions were not sufficiently changed to rebut the presumption of a well-founded fear of future persecution that arises from a showing of past persecution. The immigration judge discussed changed country conditions at length.

-7-

The record before the immigration judge included material from a 1998 Human Rights Watch World Report, a 1997 State Department Country Profile on Peru, a 1999 State Department Country Report on Peru, a 2000 State Department Country Report on Peru and various other articles and reports dated through April 11, 2000. The immigration judge noted that these sources agreed generally that the Peruvian government under President Fujimori had captured Abimael Guzman, leader of the Shining Path, and greatly reduced the ranks of Shining Path rebels. In fact, President Fujimori's campaign against the Shining Path resulted in a dramatic decrease in the number of emergency or "red" zones and a partially successful containment of remaining Shining Path members in rural areas. The immigration judge found, however, that the documentary evidence still showed substantial Shining Path activity as well as uncertainty surrounding ongoing presidential elections that raised the possibility of instability and a renewal of power for the Shining Path. The immigration judge noted in particular several murders by Shining Path guerrillas in 1999, an attack by a group of forty rebels in 1999, and the assassination of thirty-six low level community officials and leaders of social movements in the first half of 1998. The immigration judge noted that some attacks occurred in the month before he rendered his opinion.

Because the immigration judge ultimately determined that the petitioners held a well-founded fear of future persecution based on their past persecution and insufficiently changed country conditions, he granted asylum. He did not address the alternative forms of relief of withholding removal or relief under Article III of the Convention Against Torture.

The INS appealed to the BIA. The BIA accepted the immigration judge's findings regarding credibility and regarding the petitioners' unrebutted assertions about the acts of past persecution. The BIA found, however, that the immigration judge's finding of past persecution was based on wealth rather than a statutorily protected basis such as imputed political opinion. The BIA also determined in the

alternative that changed country conditions overcame the presumption of an objectively reasonable, well-founded fear of future persecution.

In reaching this conclusion regarding changed country conditions, the BIA noted several factors. First, the BIA emphasized that several members of Ms. De Brenner's family remained in Peru and were not harmed by the Shining Path. Second, the BIA emphasized that the last threat members of Ms. De Brenner's family received in Peru was a 1997 threat and demand letter from the Shining Path. This threat resulted in no harm to the family even after the family refused to comply with the demands. Third, the BIA emphasized the general success that President Fujimori's regime enjoyed in its fight against the Shining Path. Finally, the BIA explained that President Fujimori's regime diminished remaining Shining Path forces to such an extent that ongoing acts of violence were limited to attacks on persons considered key targets or attacks in remote areas of the country.

The petitioners filed a motion to reconsider in which they asked the BIA to reopen the case and reconsider its position. The petitioners argued that the BIA committed legal error when it failed to apply a mixed-motive analysis and consider the possibility that Shining Path guerrillas persecuted the petitioners due to both their wealth and their imputed political opinions. The petitioners also urged the BIA to examine additional evidence regarding changed country conditions. The BIA considered the new evidence but rejected the motion, stating, "[e]ven though the Shining Path members may have believed that the respondent was affiliated with the then-governing party in Peru, we believe that the impetus for her difficulties with the guerrillas was her alleged wealth, as we stated in our opinion." This appeal followed.

II.

To be eligible for asylum, an applicant must show that he or she is a "refugee." A refugee is an alien who is unable or unwilling to return to her country of origin

"because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Where there has been persecution on account of political opinion, it does not matter if the applicant actually holds the political opinion that the persecutor attributes to her. Rather, we consider "the political views the persecutor rightly or in error attributes to [a] victim[]. If the persecutor attributed a political opinion to the victim, and acted upon the attribution, this imputed view becomes the applicant's political opinion as required under the Act." Sangha v. INS, 103 F.3d 1482, 1489 (9th Cir. 1997); see also, Vera-Valera v. INS, 147 F.3d 1036, 1039 (9th Cir. 1998) (finding that Shining Path guerillas imputed a political opinion to a leader of a street vendors association and based their persecution of the street vendor on this imputed opinion); Ravindran v. INS, 976 F.2d 754, 760 (1st Cir. 1992) ("An imputed political opinion, whether correctly or incorrectly attributed, may constitute a reason for political persecution within the meaning of the Act.").

Further, persecution due to a statutorily protected ground may provide a basis for a finding of refugee status even though other, nonprotected criteria might have provided additional motivation for the persecutor's actions. See Tarubac v. INS, 182 F.3d 1114, 1119 (9th Cir. 1999) ("[T]he presence of a nonpolitical motive for persecution does not, without more, prove the absence of a political motive."); Borja v. INS, 175 F.3d 732, 735 (9th Cir. 1999) ("The plain meaning of the phrase persecution on account of the victim's political opinion, does not mean persecution *solely* on account of the victim's political opinion.") (internal quotations omitted). Accordingly, where a communist regime that seeks to overthrow the current economic and political infrastructure of a nation and install an agrarian peasant state targets wealthy individuals, it is not sufficient merely to label the past persecution as nonpolitical extortion or persecution "on account of wealth." Rather, it remains necessary to carefully examine the record to determine whether the evidence shows that the persecution also occurred on account of a protected ground.

If an applicant demonstrates past persecution based upon a statutorily protected ground, such as actual or imputed political opinion, a presumption arises that she holds "a well-founded fear of persecution on the basis of the original claim." 8 C.F.R. § 208.13(b)(1). The DHS may rebut this presumption through showing by preponderant evidence that country conditions in the country of origin have undergone a "fundamental change" from the time of the persecution and that the fundamental change is sufficient to eliminate the basis for the applicant's fear of future persecution. 8 C.F.R. §§ 208.13 (b)(1) and 208.13(b)(1)(i)(A). If the DHS does not satisfy this burden of rebuttal, the applicant is eligible for asylum.

We affirm the BIA's "decision if it is supported by substantial evidence on the administrative record considered as a whole." Awale v. Aschroft, 384 F.3d 527, 530 (8th Cir. 2004); INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992). We have held this to mean that we may not overturn the BIA's denial of relief "unless 'the evidence [is] so compelling that no reasonable fact finder could fail to find the requisite fear of persecution.'" Perinpanathan v. INS, 310 F.3d 594, 597 (8th Cir. 2002) (quoting Feleke v. INS, 118 F.3d 594, 598 (8th Cir. 1997)). We review the BIA's legal determinations *de novo*, but afford the BIA deference in the interpretation of ambiguous statutory terms if the "interpretation is reasonable and consistent with the statute." Corado v. Ashcroft, 384 F.3d 945, 947 (8th Cir. 2004).

Applying these principles to the facts of the present case, we find that the administrative record compels a finding of past persecution on account of imputed political opinion. The BIA's decision to the contrary lacks the support of substantial evidence. With little analysis, and no recognition of the undisputed evidence that the Shining Path imputed political opinion to Ms. De Brenner, the BIA declared that economic rather than political criteria served as the "impetus" for the Shining Path's actions. In reaching this conclusion, the BIA failed to acknowledge that Shining Path guerrillas expressly named Ms. De Brenner as a member and supporter of the APRA, accused her family of supporting the government, and mistakenly singled her out as

an actual worker for the APRA (alleging that she was employed as the personal secretary of the Director of the Mineral Bank who was a senior, active member of the APRA). In addition, the record contained numerous references to the fact that the Marxist revolutionary Shining Path guerrillas targeted bank employees and employees of "imperialist" multinational corporations in particular. The guerillas, therefore, effectively singled out certain members from wealthy sectors of the Peruvian economy or people associated with the economic infrastructure of the nation and labeled them as political enemies due to their participation in the capitalist economy. See, e.g., Vera-Valera, 147 F.3d at 1039 ("Conflating his position with that of the government, Sendero Luminoso members accused him of being a spy for the government, a capitalist bureaucrat and a traitor.").

The BIA itself, in its denial of the petitioners' motion to reconsider, stated, "[e]ven though the Shining Path members may have believed that the respondent was affiliated with the then-governing party in Peru, we believe that the impetus for her difficulties with the guerrillas was her alleged wealth, as we stated in our opinion." This statement make clear that the BIA in this instance improperly demanded that persecution occur *solely* due to a protected basis. There is no such requirement in the statute and the BIA's insertion of such a requirement is not the type of reasonable agency interpretation that demands our deference. See Osorio v. INS, 18 F.3d 1017, 1028 (2nd Cir. 1994) ("[T]he conclusion that a cause of persecution is economic does not necessarily imply that there cannot exist other causes of the persecution."); Shoafera v. INS, 228 F.3d 1070, 1075 (9th Cir. 2000) (stating that mixed motives do not preclude a finding of refugee status). Given the overwhelming evidence of an imputed political opinion in this case, and given the BIA's apparent imposition of a single motive requirement, we do not find substantial evidence to support the BIA's conclusion.

Our decision is also based on the BIA's failure to acknowledge the relationship between the Shining Path's economic and political agendas. In this case, there is a

strong argument that the Shining Path imputed certain political opinions to all wealthy Peruvians. Of course, we do not hold today that all threats or attacks upon wealthy individuals by radical communist insurgents amount to politically motivated persecution. We do note, however, that in a case such as this, where an insurgent group's known goal is to replace the economic and political institutions of a country with a peasant state, and where it is also known that the insurgents, in their written threats, singled out Ms. De Brenner as the purported member of a specific political party, it is an oversimplification to label the threats as simple extortion without carefully examining the record for particularized evidence of imputed political opinion.

The DHS relies on Elias-Zacharias, 502 U.S. 478, to support its position. In Elias Zacharias, the Supreme Court held that attempts by guerillas to recruit an asylum applicant, and attacks on the applicant for not joining their cause, did not amount to politically motivated persecution. Id. at 483. The Court found that resistance to recruitment might have been motivated by any of a number of nonpolitical reasons. See id. at 482 ("Even a person who supports a guerilla movement might resist recruitment for a variety of reasons–fear of combat, a desire to remain with one's family and friends, a desire to earn a better living in civilian life, to mention only a few."). The Court concluded simply that retaliation for non-cooperation does not necessarily mean that insurgents believed an applicant resisted on political grounds. In Elias-Zacharias, then, the record did not compel the conclusion that imputed or actual political opinion motivated the insurgents' actions.

The DHS argues that the extortionate demands upon Ms. De Brenner and her family were analogous to the recruitment efforts in Elias-Zacharias—efforts by insurgents to further their cause without reference to the political views of the victim. We disagree. Unlike Elias-Zacharias, the record in the present case contains undisputed evidence that the insurgents labeled Ms. De Brenner a political enemy. Elias- Zacharias simply did not involve this type of undisputed evidence of political

-13-

motivation.[2] The BIA's decision to isolate the Shining Path's extortionate demands and threats from the balance of the evidence in this case led to the insupportable conclusion that the threats were non-political demands for financial and material support.

Regarding changed country conditions, the BIA committed legal error in the apportionment of the burden of proof. The petitioners were entitled to a presumption of refugee status upon a showing of past persecution due to a protected basis. 8 C.F.R. § 208.13 (b)(1). Although the BIA did not find past persecution due to a protected basis, the BIA did purport to set forth an alternative basis for relief. Accordingly, the BIA's analysis of changed country conditions should have proceeded on the assumption that the petitioners had established past persecution on account of a protected basis. This would have placed the burden of rebuttal on the DHS. When the BIA presented its alternative basis for denying relief, however, it placed the burden on the petitioners. The BIA stated in its order denying relief,

---

[2]Our conclusion is consistent with many cases in which courts refused to read Elias-Zacharias as having established a bright line rule for the exclusion of instances of extortion or recruitment as bases for finding past persecution. These cases, like our opinion above, show that careful attention to the particular circumstances surrounding the alleged persecution remains necessary even if the persecution is generally categorized as extortion or recruitment. Compare Boyarintsev v. Ashcroft, No. 02-4213, 2004 WL 627009 at *3 (7th Cir. Mar. 25, 2004) (unpublished) (denying asylum where an applicant failed to show that extortionate demands were on account of "political beliefs, rather the prospect of personal economic gain"), and Orobio v. Ashcroft, No. 02-2841, 2003 WL 21853240 at *2 (3d Cir. July 24, 2003) (denying asylum where a Philippino businessman failed to show that extortionate demands and threats of retaliation from an insurgent communist regime were linked to the businessman's political opinions) with Agbuya v. INS, 241 F.3d 1224, 1229-1230 (9th Cir. 2001) (finding past persecution on account of imputed political opinion and rejecting arguments that persecution was merely extortion where communist insurgents targeted an employee of a mining company who had taken actions in the course of her employment that the communists viewed as contrary to the benefit of laborers).

-14-

"Based on this evidence, and in light of the fact that the lead respondent has provided neither testimony nor independent evidence contradicting the Department of State's evaluation of the current conditions in Peru, *we conclude that she did not establish her eligibility for asylum*." (emphasis added). Because the BIA did not conduct the proper analysis to establish a truly alternative basis for relief, we cannot rely upon the BIA's determination as to changed country conditions.

"When the BIA applies an incorrect legal standard, the proper remedy typically is to remand the case to the agency for further consideration in light of the correct standard." Corado, 384 F.3d at 948 (8th Cir. 2004); see also, Hagi-Salad v. Ashcroft, 359 F.3d 1044, 1049 (8th Cir. 2004) ("In these circumstances, our proper disposition is to remand."). Accordingly, in light of our disposition of the issue of past persecution, we remand to the BIA for a determination of whether country conditions in Peru are sufficiently changed to overcome the presumption that exists in petitioners' favor. On remand, the BIA may reopen the record to consider more recent evidence of country conditions. See INS v. Orlando Ventura, 537 U.S. 12, 18 (2002) (holding that well-established principles of administrative law required remand to the BIA for consideration of changed country conditions and stating that "remand could lead to the presentation of further evidence of current circumstances in [the petitioners' country of origin] — evidence that may well prove enlightening given the five years that have elapsed since the report was written.")

We reverse and remand to the BIA for further proceedings consistent with this opinion.

_____